# In the United States Court of Federal Claims

**No. 22-1452C**
**Filed: February 25, 2024**
**Reissued for Publication: March 22, 2024[1]**

```
* * * * * * * * * * * * * * **
                                *
UTECH, INC.,                    *
                                *
                                *
            Protestor,          *
                                *
v.                              *
                                *
UNITED STATES,                  *
                                *
            Defendant,          *
                                *
v.                              *
                                *
PROVATION SOFTWARE, INC.,       *
                                *
                                *
            Defendant-Intervenor. *
                                *
* * * * * * * * * * * * * * **
```

**Alan Grayson**, Orlando, Florida, for protestor.

**Kyle S. Beckrich**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Daniel F. Roland**, Trial Attorney, Commercial Litigation Branch, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C. **Aleia Barlow**, Staff Attorney, United States Department of Veterans Affairs, and **Shawn Larson**, Staff Attorney, United States Department of Veterans Affairs, of counsel.

**Alex P. Hontos**, Dorsey & Whitney LLP, Minneapolis, Minnesota, for intervenor. With him was **Eric Weisenburger**, Dorsey & Whitney LLP, Minneapolis, Minnesota.

---

[1] This Opinion was issued under seal on February 25, 2024. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued without redactions since the parties proposed no redactions in response to the court's request.

**O P I N I O N**

**HORN, J.**

In the above captioned bid protest, the protestor[2] filed a post-award bid protest challenging the decision by the United States Department of Veterans Affairs (VA) to award a contract to intervenor, Provation Software, Inc. (Provation), for "an endoscopy information system to be used in various parts of the U.S. Department of Veterans Affairs ('VA') healthcare network." Defendant and intervenor have filed motions to dismiss protestor's complaint.

**FINDINGS OF FACT**

On January 26, 2021, the VA issued Solicitation No. 36C10G20Q0050 (the Solicitation) "to solicit offers for an Indefinite Delivery-Indefinite Quantity (IDIQ) Brand Name or Equal contract for an Endoscopy Information System (EIS)." (capitalization in original). According to the Solicitation:

> The Veterans Health Administration (VHA) Equipment Life Cycle Management (ELCM) Program has identified Information System: Data Management: Endoscopy here after [sic] referred to as Endoscopy Information Systems (EIS) as a candidate for VA-wide (otherwise referred to as "national") contract award. EIS are designed to manage GI [gastrointestinal] and Pulmonary endoscopy clinical (documentation and embedded images) and administrative data (e.g., finances, reimbursement, materials management) within a healthcare facility. EIS consist of

―――――――――――――

[2] Protestor's complaint begins: "This is a procurement protest filed by Utech, Inc., d/b/a EndoSoft. ('EndoSoft')." The complaint also states: "Under the Solicitation's Section 4.3, LEGACY DATA MIGRATION SERVICES, the specific requirement is to migrate existing endoscopy data from the Olympus EndoWorks system, which was discontinued by Olympus in 2018." (capitalization in original; footnote omitted). The omitted footnote states that the Olympus EndoWorks system "is not the same as EndoSoft's system; EndoSoft's system is called EndoVault." Protestor also filed a motion for protective order and protestor's counsel signed the motion as "Counsel for Plaintiff Utech Inc. d/b/a EndoSoft." The Solicitation's Scope of Work included with the Solicitation indicated that one of the brand name for commercially available, off the shelf software was "Utech EndoSoft." After the defendant and intervenor filed a motion to dismiss, protestor filed a response which included a footnote which stated: "Plaintiff [sic] normally refers to itself as EndoSoft, but both motions [defendant's motion to dismiss and intervenor's motion to dismiss] refer to it as Utech, so for the sake of simplicity, Utech will adopt that convention. In the Complaint, in all exhibits and in the administrative record, any references to EndoSoft are references to Utech." (alterations added). Given the confusion used for the name of the protestor in the above captioned protest, the court generally refers to the protestor as "protestor," however, all quotations remain unchanged, and include references to protestor as Utech, Utech, Inc., EndoSoft, Endosoft, and Utech EndoSoft.

hardware, including servers for image acquisition and storage, computer workstations for data entry and viewing and peripheral devices (e.g., printers) that are connected to the VA network behind a medical device virtual local area network (VLAN), as well as software, including an EIS electronic medical record (EMR) application, operating systems, a database management system, interfaces and other application programs. EIS are dedicated systems intended to collect, store, analyze, retrieve, display, and print information related to GI and Pulmonary endoscopy procedures. EIS exchange information with endoscopic video systems usually following DICOM (Digital Imaging and Communications in Medicine), a standard in the field of medical informatics that ensures interoperability. EIS allows digital image transmission to any networked part of the hospital, direct access to stored images, simultaneous access to images for several different physicians (e.g., surgeons and emergency room personnel), and centralized consultation for comparisons.

(capitalization in original; alterations added). The Solicitation's Scope of Work stated:

The Offeror shall deliver to the Government a commercially available, off the shelf software (COTS) in accordance with specific task orders under this contract. The brand name or equal (e.g., Provation, Pentx EndoPro, Utech EndoSoft) or equal endoscopy information system (EIS) is comprised of software and related hardware (system) that will produce endoscopy clinical procedure documentation.

The Scope of Work continued:

The Contractor shall provide all personnel, software, hardware, software upgrades, software maintenance and support, transportation, tools, material and supervision necessary to deliver the products and perform the services for the EIS in both the Test and Production environments within the Department of Veterans Affairs (VA) Medical Centers in accordance with each specific task order placed under this contract. The upgrades, maintenance, and support shall include all scheduled software updates, technical support, unscheduled repairs/corrective maintenance, database administration support, and training services described in this PD [product description]. The EIS shall utilize the existing Government owned and operated IT network(s). The EIS shall utilize either the hardware (servers, workstations, printers, etc.) that is provided by the Contractor under the contract task order or the hardware that is provided by the Government as determined by the VA facility. The Contractor shall identify minimum specifications for VA networks and hardware that allows the EIS system software to operate.

(alteration added). The Solicitation explained that "[t]asks under this PD shall be performed at VHA facilities throughout the United States and all of its territories. Delivery

requirements and specific locations shall be specified under each individual order."
(alteration added). Pursuant to the Solicitation

> [t]he period of performance (POP) shall be a twelve (12) month base period,
> with four (4) consecutive option periods of (12) months each. Any VA
> Medical Center (VAMC) that adopts this contract after the beginning of the
> base year or any option shall only be entitled to the benefit of the period
> remaining in the base year or option period, as applicable.

(alteration added). The Solicitation further indicated:

> This procurement is set-aside based on an order of priority as established
> in 38 U.S.C. 8127.
>
> TIERED EVALUATIONS INCLUDING LARGE BUSINESS CONCERNS:
> This solicitation is being issued as tiered evaluation with the following tiers:
> (1) SDVOSB concerns, (2) VOSB concerns, (3) small business concerns
> with HUBZone small business concerns and 8(a) participants having
> priority; and (4) large business concerns. If award cannot be made, the
> solicitation will be cancelled, and the requirement resolicited.

(capitalization in original).

> Regarding the evaluation of the proposals, the Solicitation provided:

> EVALUATION
> Awards will be made based on the best overall (i.e. best value) proposal
> that is determined to be the most beneficial to the Government, with
> appropriate consideration given to the four following evaluation factors:
> Technical, Past Performance, Socio-Economic, and Price. The Government
> will award a contract resulting from this solicitation to the responsible offeror
> whose offer best conforms to the solicitation and will be most advantageous
> to the Government, price and other factors considered. Once again,
> appropriate consideration will also be given to the following four (4)
> evaluation factors:
>
> Non-Price Factors (listed in descending order of importance):
> TECHNICAL
> PAST PERFORMANCE
> SOCIO-ECONOMIC
>
> Price Factors:
> PRICE
>
> Technical, Past Performance and Socio-Economic are considered EQUAL
> when combined. The non-price factors when combined are significantly

more important than Price. Technical capability is significantly more important than the Past Performance. Past Performance is significantly more important than Socio-Economic considerations. All non-price factors, when combined, are significantly more important than Price.

Contractors are cautioned that the award may not necessarily be made to the Offeror proposing the lowest price, or to the Offeror with the most highly rated technical proposal. Award may be made to other than the lowest priced proposal, if the Government determines that a price premium is warranted due to the merits of one or more of the non-price factors. Additionally, the Government will not establish an IDIQ with any Offeror whose price is evaluated as "questionable for reasonableness".

The Government intends to award one Requirements contract with four, 12-month option periods. Any award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the following four evaluation factors: Technical, Past Performance, Socio-Economic, and Price. To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Factor. The non-Price Factors combined are significantly more important than the Price Factor. Offerors are cautioned that the award may not necessarily be made to the lowest price offered or the most highly rated technical proposal. The Government will award the requirements contract resulting from this solicitation to the responsible offeror whose proposal conforming to the solicitation will be most advantageous to the Government, price and non-price factors considered.

In accordance with (IAW) FAR 15.306(a) (3), the Government reserves the right to award without discussions based upon the initial evaluation of proposals. Offerors will thus be encouraged to submit their best offers in response to this solicitation. Evaluation of the offeror's proposal shall address each Non-Price factor as it applies to the Product Description (PD). Offerors must provide certification that they are verified within Vendor Information Pages (VIP). Any offeror who fails to provide proof they are verified within VIP as a SDVOSB with their proposal shall be deemed UNACCEPTABLE and thus, ineligible for award.

(capitalization in original). Regarding price, the Solicitation required offerors to propose pricing for numerous contract line items (CLINs) listed in a "Cost/Price Schedule," and explained:

This is a Requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the

Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

In the Solicitation, at "Attachment 13 – VA Endoscopy Procedure" the Solicitation included a list of VA medical facilities throughout the United States, which identified the following information for each facility: "Facility Sub-District, VISN [Veterans Integrated Service Network], VISN #, Facility Number, City, State, Facility Name, Facility Address, Approximate # Rooms, Approximate # Travel Carts, Rough Estimate # Procedures, and Assumed Brand Currently In Use." (alteration added). The complete list of the VA medical facilities is included below:

| Facility Sub-District | VISN Name | VISN # | Facility Number | City | State | Facility Name | Facility Address | Approximate # Rooms | Approximate # Travel Carts | Rough Estimated # Procedures | Assumed Brand Currently In Use |
|---|---|---|---|---|---|---|---|---|---|---|---|

The VA addressed concerns raised by potential bidders in a series of questions and answers before the proposals were due. Relevant to the above captioned protest, a potential offeror asked: "Since we represent a product different than the one listed in the CLINs, our offering isn't an apples to apples comparison, with regards to the CLINs. Questions: What do the quantities listed in the CLINs represent? Are we expected to match those quantities?" The VA responded:

> You should provide a proposal that meets the requirement for Twenty four (24) VA Facilities annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased. A brand name <u>or equal</u> product must be identified for each item listed in the price schedule. Proposed products must be either the brand name <u>or be an equal to the brand</u> listed on the Price Schedule. Changes to the price cost schedule to meet your format is acceptable. However, the Offeror must clearly describe any modifications it plans to make to a product, or equal product, to make it conform to the solicitation requirements.

(emphasis in original). The VA, in response to the question, "CLIN 0004 indicates the price schedule is based off twenty-four (24) individual sites; however, CLIN 0001 only has a quantity of six (6). Will CPRS and VISTA image integration to include project management, implementation, installation, training, and support only be required at six (6) sites?" the VA answered: "CPRS and VISTA image integration to include project management, implementation, installation, training, and support is at twenty four (24) sites annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased." Similarly, in response to the question: "How many sites is the cost price schedule based off?" The VA responded: "Twenty four (24) annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased."

The deadline to submit proposals was February 16, 2021. The VA received bids from four offerors: Summit Imaging Inc., Thundercat Technology, LLC, Namtek Corp., and intervenor Provation. It is undisputed that protestor did not submit a proposal. According to protestor's complaint, however, protestor indicated it "arranged to provide such items through an offeror named Namtek."

Regarding Summit Imaging Inc., the evaluation documents reflect that "[a]t some point after the conclusion of the physical evaluation, the CS [Contract Specialist] discovered Summit's SAM certification was not valid at the time of their offer." (alterations added). Regarding Namtek Corp., the evaluation documents reflect:

> The Government received one VOSB proposal from Namtek Corporation (Namtek) who offered the Utech EndoSoft brand EIS. The phase 1 (Volume

l) rating resulted from a basic literature review of the written content of the offeror's proposal. Namtek's Volume 1 proposal was initially found to be acceptable by meeting the salient characterictics [sic] in accordance with the solicitation. After the technical evaluation and during the course of the evalution [sic], the CS searched the SAM.gov database and discovered a recent INDEFINITE active exclusion from the Department of the Navy dated 23 March 2021, which was valid at the time they submitted their offer.

On December 23, 2021, an email was sent to the owner of Namtek asking if Namtek is still operating as a business. Namtek immediately responded that "Namtek is no longer operating as a business" [sic] Based on the aforementioned information, Namteck [sic] was removed from consideration for award.

(capitalization in original; alterations added). After comparing the only two remaining offerors' proposals, intervenor Provation's proposal and the proposal submitted by Thundercat Technology, LLC, the VA ultimately made an award to intervenor Provation on September 29, 2022.

According to protestor's complaint, "[w]hen the Solicitation was issued, in January 2021, EndoSoft [protestor] surveyed the competitive landscape, and judged that the Solicitation's 'tiering' made it unlikely that a company that was not an SDVOSB or a VOSB concern would receive an award." (alterations added). As reflected above, protestor chose not to submit a proposal as a prime contractor. Instead, protestor alleges it submitted a proposal as a proposed sub-contractor to Namtek Corp., and represents that it did not know about the debarment of Namtek Corp.

Protestor makes a number of broad allegations in its complaint that after the proposal submission deadline, protestor learned "from the VA staff at a location where Utech is the incumbent contractor, that the VA intended to employ (*i.e.*, misuse) the Solicitation to supplant Utech at that location." (emphasis in original). In its complaint protestor alleges:

EndoSoft representatives were onsite at a VA location that employs the EndoSoft endoscopy information under an existing contract. This VA location had been planning to upgrade with EndoSoft software, including new functionality. The EndoSoft representatives were informed that the VA had issued guidance not to proceed with the purchase, due to an impeding [sic] decision on the "national" contract. This is a clear reference to the Solicitation (even though there was no award until six months later). This was repeated by e-mail to EndoSoft from a VA health center today.

(alteration added; footnotes omitted). Protestor also alleges in the complaint:

Under the Solicitation's Section 4.3, LEGACY DATA MIGRATION SERVICES, the specific requirement is to migrate existing endoscopy data

from the Olympus EndoWorks system, which was discontinued by Olympus in 2018. This establishes, in effect, that this solicitation was limited only to facilities still using the Olympus EndoWorks system, and the numbers in the Solicitation (annual CLINs with a quantity of 24) confirm that.

(capitalization in original; footnote omitted). Protestor further contends in its complaint:

With the Solicitation, VA provided a list of all the VA's major medical facilities and their current endoscopy information system in use – *see* "Attachment 13 VA Endoscopy Procedures Facility List." The number of listed facilities using EndoWorks plus the number of facilities using "None-CPRS" is 27. (Where the hospitals are using None-CPRS, no migration of existing endoscopy data would be required.) Three of those facilities (VA Little Rock, VA Tampa and VA San Juan) all contracted with EndoSoft as this solicitation was being posted. Twenty-seven minus 3 is 24, which is consistent with the CLIN 'ask' for 24 medical centers to be served.

(emphasis in original). Protestor continues in its complaint:

Also on March 22, 2022, EndoSoft representatives learned from the VA that the evaluation scheme under the Solicitation had been altered. Evidently, performance of an existing project (*i.e.*, transition to the Cerner electronic health record system) was made part of the evaluation process for award here. The Solicitation does not give any indication that there would be such an additional evaluation. To EndoSoft's knowledge, there was never any amendment of the Solicitation, changing the evaluation scheme in this manner. EndoSoft was engaged in the transition to the Cerner electronic health record system, independently of the Solicitation, so including this as part of the evaluation scheme would have motivated EndoSoft toward submitting a proposal (meaning that it is reasonably likely that EndoSoft would have done so).

Procedural History

Initially, protestor filed an agency-level protest which was dismissed, as described in protestor's complaint, "without reaching the merits, on May 6, 2022." Protestor subsequently filed a protest at the United States Government Accountability Office (GAO). See Utech, Inc- dba EndoSoft, B-420755.1, 2022 WL 3026804 (Comp. Gen. Jul. 29, 2022). At the GAO, protestor argued that "the solicitation was unclear as to whether the contract that will be awarded will apply to all VA locations." Id. at *2. Protestor asserted before the GAO that "many, but not all, VA locations obtain endoscopy information systems through separate, location-specific contracts. EndoSoft asserts that the agency intends through the current solicitation to establish a framework for parts of the VA that do not obtain endoscopy information systems under stand-alone contracts." Id. (internal reference omitted). The GAO found that "this basis of protest is untimely" because the

protest was not filed "prior to the closing date for the receipt of quotations." Id. (citing 4 C.F.R. § 21.2(a)(1) (2021)). Further, the GAO stated that

> [w]hile it is not clear if all VA locations will be required to utilize this contract, these solicitation provisions clearly notify offerors that the contract resulting from this solicitation was eligible to be used by all VA locations in the United States and its territories. If EndoSoft objected to this requirement, Endosoft was required to protest prior to the February 16 due date for quotations. Since EndoSoft did not submit its protest to the agency until April 1, the agency-level protest, and the subsequent protest to our Office, are untimely.

Id. (alteration added).

At the GAO, protestor also argued "that the evaluation scheme under the solicitation was amended to require performance of an existing project. According to EndoSoft, because this materially changed the evaluation process the agency is required to allow new offerors to compete." Id. at *3. The GAO found "that the solicitation was not amended to change the evaluation scheme to require performance of an existing project," and because "the protestor has not provided any evidence to demonstrate that the solicitation was amended, as alleged, we dismiss this basis of protest." See id. (citing 48 C.F.R. § 21-1(c)(4)).

Protestor further alleged at the GAO "that the competitive landscape has changed since the issuance of the solicitation, and it is therefore no longer reasonable for the VA to conduct the procurement using a tiered evaluation," and claimed that had the agency removed the tiered evaluation criteria and requested new proposals, "that it would submit a proposal in its own name." Id. The GAO concluded that

> the tiered approach to evaluating proposals which was included in the solicitation as issued contemplated that the agency might not receive proposals from any category of small business concerns, and specifically allowed large business concerns to submit proposals. The fact that EndoSoft did not submit a proposal, but now would like to, is not a basis to find that the agency violated any procurement law or regulation, or that that [sic] the agency must amend the solicitation.

Id. (footnote omitted; alteration added).

After the GAO denied the protest, protestor filed its protest in this court. Protestor's complaint in the United States Court of Federal Claims alleges:

> When the Solicitation was issued, in January 2021, EndoSoft surveyed the competitive landscape, and judged that the Solicitation's "tiering" made it unlikely that a company that was not an SDVOSB or a VOSB concern would receive award. "Tiered" here meant that if EndoSoft had submitted a proposal, that proposal would have been relegated to a lower "tier," beneath

SDVO SBCs, VOSBs, HUBZone concerns and Section 8(a) concerns, and for a non-universal procurement, EndoSoft was under no obligation to expend the resources necessary to do so. EndoSoft did not have the same motivation to submit a proposal that it certainly would have had, if the Solicitation had stated that it was universal in scope, supplanting existing contracts. Thus the Solicitation's "tiering," together with the Solicitation provisions limiting award to the 24 VA sites not already having endoscopy information system contracts led EndoSoft not to submit a proposal itself.

(footnotes and internal references omitted). In Count I of the complaint filed in this court, protestor argues that the VA's decision to

characterize the contract here as universal and exclusive throughout the VA health system for endoscopy information system requirements, is arbitrary and capricious, an abuse of discretion, and contrary to procurement law, because it is (a) contrary to the terms of the Solicitation, or (b) a change so substantial as to require re-solicitation, or (c) an out-of-scope or "cardinal" change.

In Count II, protestor argues that the VA "changed the evaluation procedures in mid-stream, by making performance of an existing project (*i.e.*, transition to the Cerner electronic health record system) part of the evaluation process." (emphasis in original). In Count III, protestor argues that the VA acted irrationally by continuing to use the "tiered" evaluation system indicated in the Solicitation because mid-procurement transactions and Namtek's debarment narrowed the field of competition such that "there was no rational basis to determine the contract price to be fair and reasonable."

In response to the protestor's complaint, defendant and intervenor each filed motions to dismiss protestor's bid protest complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) and for failure to state a claim under RCFC 12(b)(6). The motions have been fully briefed and oral argument was held.

## DISCUSSION

Standing

Defendant's motion to dismiss and intervenor's motion to dismiss both allege that protestor lacks standing to bring its claims in this court. Specifically, regarding Count II and Count III of protestor's complaint, defendant argues "Utech's failure to bid on the Solicitation or protest before the close of bidding deprives it of standing." The Tucker Act grants the United States Court of Federal Claims

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged

violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(a)(1) (2018); see also CACI, Inc.-Fed. v. United States, 67 F.4th 1145, 1151 (Fed. Cir. 2023); SEKRI, Inc. v. United States, 34 F.4th 1063, 1071 (Fed. Cir. 2022); Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). As explained by the United States Court of Appeals for the Federal Circuit:

> Under the Tucker Act, the Claims Court has jurisdiction over actions "by an interested party objecting to . . . the award of a contract [by a federal agency.]" 28 U.S.C. § 1491(b)(1). We have interpreted the statutory language "interested party" to be an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (emphasis and citation omitted). "To prove a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting Rex Serv., 448 F.3d at 1308).

CACI, Inc.-Fed. v. United States, 67 F.4th at 1151 (alterations in original). Stated otherwise, in order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); see also Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); AECOM Mgmt. Servs., Inc. v. United States, 147 Fed. Cl. 285, 290 (2020); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012).

Therefore, in a post-award bid protest, such as the above-captioned bid protest, the "protestor must 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783-84 (2018) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)); Timberline Helicopters, Inc. v. United States, 140 Fed. Cl. 117, 120 (2018); Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 269 (2012).

Defendant and intervenor each alleged that the court lacks jurisdiction over protestor's claims in their respective motions to dismiss. After the motions were fully briefed, the United States Court of Appeals for the Federal Circuit issued its decision in

CACI, Inc.-Federal v. United States, 67 F.4th 1145. In CACI, the Federal Circuit indicated that the United States Court of Federal Claims

> concluded that CACI did not have standing because the OCI [organizational conflict of interest] would have prevented CACI from being eligible for the award. In other words, CACI did not show that it had a "substantial chance it would have received the contract award but for the alleged error [regarding the technical deficiencies] in the procurement process." J.A. 9 (internal quotation marks and emphasis omitted) (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

CACI, Inc.-Fed. v. United States, 67 F.4th at 1150 (first alteration added). The Federal Circuit noted that the United States Court of Federal Claims "dismissed CACI's complaint for lack of jurisdiction (lack of standing)." Id. at 1151. The Federal Circuit explained, however,

> [t]he standing issue here presents a question of statutory standing rather than Article III standing, Acetris Health, LLC v. United States, 949 F.3d 719, 727 (Fed. Cir. 2020) (characterizing the "interested party" inquiry as "statutory standing"), there being no contention that CACI lacks Article III standing. Although the Supreme Court had "on occasion . . . treated [statutory standing] as effectively jurisdictional," Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 & n.2, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)), in Lexmark, the Supreme Court held that statutory standing, occasionally referred to as the zone-of-interests requirement, is not jurisdictional. Id. Rather, it is "an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Id. at 127, 134 S. Ct. 1377.

> Thus, as we have confirmed, "the Supreme Court has . . . clarified that so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction." Lone Star Silicon Innovations LLC v. Nanya Tech. Corp., 925 F.3d 1225, 1235 (Fed. Cir. 2019) (citing Lexmark, 572 U.S. at 128 n.4, 134 S. Ct. 1377); see also Meenaxi Enter., Inc. v. Coca-Cola Co., 38 F.4th 1067, 1072 n.2 (Fed. Cir. 2022). This is true even when the cause of action relies on a waiver of sovereign immunity. See Wilkins v. United States, 598 U.S. ——, 143 S. Ct. 870, 879, 215 L. Ed. 2d 116 (2023); Walby v. United States, 957 F.3d 1295, 1300 (Fed. Cir. 2020) (citing United States v. Kwai Fun Wong, 575 U.S. 402, 410, 135 S. Ct. 1625, 191 L. Ed. 2d 533 (2015)). Our prior caselaw treating the interested party issue as a jurisdictional issue, see, e.g., Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co., 523 U.S. at 102–04, 118 S. Ct. 1003), is no longer good law in this respect. The Claims Court here erred in treating the issue of statutory standing as jurisdictional.

CACI, Inc.-Fed. v. United States, 67 F.4th at 1151 (alteration added; ellipses in original); see also REV, LLC v. United States, Aptive Res., LLC, 91 F.4th 1156, 1163 (Fed. Cir. 2024); B.H. Aircraft Co. Inc. v. United States, 89 F.4th 1360, 1363 (Fed. Cir. 2024); ASRC Fed. Tech. Sols., LLC v. United States, 169 Fed. Cl. 372, 384 (2024); CeleraPro, LLC v. United States, 168 Fed. Cl. 408, 419 (2023).

The Federal Circuit in CACI further clarified

> Under the statute, a protestor may file a protest at [the] Government Accountability Office or the Claims Court. See 41 U.S.C. § 3708(a)(1); 31 U.S.C. § 3552(a); 4 C.F.R. 21.1(c); 28 U.S.C. § 1491(b)(1). When such disputes are presented to the Claims Court, the plaintiff must be an "interested party," 28 U.S.C. § 1491(b)(1), that is, a party with a substantial chance of securing the award. See Info. Tech. & Applications Corp., 316 F.3d at 1319 (statutory standing). The Claims Court in some instances must make the statutory standing determination, i.e., whether the plaintiff is an interested party. This determination by the Claims Court is required when the plaintiff is arguing that the contracting officer made an error in evaluating the bid of another contractor. Myers, 275 F.3d at 1370; CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1359 (Fed. Cir. 2018). This is so even though statutory standing is no longer treated as a jurisdictional issue. We see nothing in Lexmark that suggests that in such cases the Claims Court may not initially determine whether a plaintiff is an "interested party," though such an initial determination is not required before addressing the merits, because statutory standing is not jurisdictional.

CACI, Inc.-Fed. v. United States, 67 F.4th at 1152 (footnote omitted). The Federal Circuit in CACI continued:

> In such instances where the Claims Court elects to make a determination of statutory standing, the Claims Court is charged only with making a preliminary determination ("substantial chance") with respect to the plaintiff's chances of securing the contract, rather than a final merits determination of contract entitlement. See Digitalis, 664 F.3d at 1384. Unless some exception to the Chenery doctrine permits final decision by the Claims Court, for example, the issue to be decided is purely legal, a remand to the agency is required to make the final determination of contract entitlement. See Oracle Am., Inc. v. United States, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (describing Chenery remand exceptions).

CACI, Inc.-Fed. v. United States, 67 F.4th at 1152.[3] The Federal Circuit stated:

---

[3] The Supreme Court in Chenery stated that "[i]f an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment." SEC v. Chenery Corp., 318 U.S. 80, 88 (1943) (alteration added). The Federal Circuit

However, the present case is different from Myers and CliniComp in that CACI is not challenging an award to a third party based on some defect in the solicitation process, but is rather challenging the contracting officer's determination that CACI's own bid had disqualifying deficiencies. In this context, the statutory standing issue and the merits issue are overlapping. Every merits issue to a bidder's qualifications is also a statutory standing issue.

CACI, Inc.-Fed. v. United States, 67 F.4th at 1152.[4]

---

explained in Oracle America, that "[t]he Chenery doctrine, however, does not invariably require a remand to the agency," in lieu of a final decision by the reviewing court, see Oracle Am., Inc. v. United States, 975 F.3d at 1290 (alteration added), but rather, as the Federal Circuit stated in CACI, "[u]nless some exception to the Chenery doctrine permits final decision by the Claims Court, for example, the issue to be decided is purely legal, a remand to the agency is required to make the final determination of contract entitlement." CACI, Inc.-Fed. v. United States, 67 F.4th at 1152 (citing Oracle Am., Inc. v. United States, 975 F.3d at 1291) (alteration added). In addition to the Chenery exception noted by the Federal Circuit multiple times in CACI, that "the issue to be decided is purely legal," see id., the Federal Circuit in Oracle America noted several other Chenery exceptions:

A remand is unnecessary when the error in question "clearly had no bearing on the procedure used or the substance of decision reached," Mass. Trs. of E. Gas & Fuel Assocs. v. United States, 377 U.S. 235, 248, 84 S. Ct. 1236, 12 L. Ed. 2d 268 (1964); if there is no reason to believe that the decision would have been different, In re Watts, 354 F.3d 1362, 1370 (Fed. Cir. 2004); if it is clear that the agency would have reached the same result, Fleshman v. West, 138 F.3d 1429, 1433 (Fed. Cir. 1998); if the result is "foreordained," Bethlehem Steel Corp. v. Gorsuch, 742 F.2d 1028, 1036 (7th Cir. 1984); if the court is not "in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed," Kurzon v. U.S. Postal Serv., 539 F.2d 788, 796 (1st Cir. 1976); or where there is no "significant chance that but for the error, the agency might have reached a different result." NLRB v. Am. Geri-Care, Inc., 697 F.2d 56, 64 (2d Cir. 1982).

Oracle Am., Inc. v. United States, 975 F.3d at 1291. The Chenery exception cases cited by the Federal Circuit in Oracle America appear to amount to a rule that a remand is unnecessary when the result reached by the agency after remand would be the same as could be reached before review.

[4] In CACI, the United States Court of Appeals for the Federal Circuit "conclude[d] that the Claims Court's statutory standing determination was erroneous because the Claims Court improperly addressed the nonjurisdictional question of statutory standing de novo despite the absence of any Chenery exception, but we nonetheless affirm the ultimate determination." CACI, Inc.-Fed. v. United States, 67 F.4th at 1156 (alteration added). The

After the <u>CACI</u> decision, the undersigned instructed all parties to file supplemental briefs on the possible impact of the <u>CACI</u> decision in the above captioned bid protest. The defendant argues:

> The <u>CACI</u> decision should not change this Court's ultimate determination on our motion to dismiss. To the extent <u>CACI</u> is relevant to defendant's motion to dismiss, it is primarily in form, not substance.  We moved to dismiss Utech's complaint pursuant to Rules of the United States Court of Federal Claims 12(b)(1) and 12(b)(6).  The latter ground was based on waiver under <u>Blue & Gold</u>, while the former ground, under RCFC 12(b)(1), was framed as a jurisdictional challenge because Utech was not a bidder in the challenged procurement—and thus not an "interested party"—and it therefore lacks standing to pursue its claims.  In light of the <u>CACI</u> Court's holding that the "interested party issue" should no longer be considered a jurisdictional matter, if the Court  agrees with the Government that Utech lacks standing, it should dismiss the complaint for failure to state a claim pursuant to RCFC 12(b)(6), instead of RCFC 12(b)(1), as we originally requested.  <u>See</u>, <u>e.g.</u>, <u>Lone Star Silicon Innovations LLC v. Nanya Tech.</u> <u>Corp.</u>, 925 F.3d 1225, 1235 (Fed. Cir. 2019) ("[F]ollowing <u>Lexmark</u>, several courts have concluded that motions to dismiss based on 'statutory standing' defects are properly brought under Rule 12(b)(6) rather than Rule 12(b)(1) in recognition of the fact that such defects are not jurisdictional.") (citations omitted).

(internal citations and footnotes omitted). Defendant also argues that "[b]eyond that formality, <u>CACI</u> is not impactful to our motion to dismiss. As noted, the Federal Circuit made clear that this Court may still address statutory standing before considering the merits." (alteration added). Additionally, defendant contends:

> Moreover, while the Federal Circuit determined that the Court of Federal Claims erred in deciding the statutory standing issue, <u>CACI</u> is meaningfully distinguishable in at least two key respects.  First, in <u>CACI</u>, the Claims Court was confronted with a challenge to the contracting officer's determination that CACI's bid had qualifying deficiencies.  <u>See</u> <u>CACI</u>, 67 F.4th at 1152. Utech made no such challenge here.  Nor could it, because Utech never submitted a bid and was not an actual or prospective bidder.  Thus, unlike in <u>CACI</u>, where the "merits issue to a bidder's qualifications" overlapped with the statutory standing issue, <u>CACI</u>, 67 F.4th at 1152, there is no such overlap here.

(internal reference omitted). Defendant continues:

---

Federal Circuit reasoned that "the Army reasonably assigned a technical deficiency under the size requirement. A single deficiency renders the proposal 'unawardable.' The Claims Court did not err in sustaining the contracting officer's finding of a technical deficiency." <u>Id.</u> at 1155–56 (internal reference omitted).

And second, the standing issue in <u>CACI</u> turned on whether <u>CACI</u>, a losing offeror, had an OCI that would have prevented it from being eligible for the award—a determination that "Congress has primarily placed . . . in the hands of the contracting officer." <u>See</u> <u>CACI</u>, 67 F.4th at 1153. Here, in contrast, no such issue is present. Rather, our standing challenge stems from Utech's failure to bid or protest before the close of bidding. Viewed another way, unlike in <u>CACI</u>, there was no determination for the contracting officer to make in the first instance here as it relates to the standing issue.

Similarly, intervenor argues:

The Government and ProVation had, prior to the recent Federal Circuit decisions, moved to dismiss Utech, Inc.'s ("Utech") protest for lack of subject-matter jurisdiction under RCFC 12(b)(1) and for failure to state a claim under RCFC 12(b)(6). The Federal Circuit's recent decision in <u>CACI, Inc.-Federal</u> explains that "statutory standing" in a bid protest is not jurisdictional. But that holding does not alter the outcome of ProVation's motion—Utech did not even submit a proposal and has no "substantial chance" of award under the solicitation and fails to state a claim for relief as a result.

(internal reference omitted). Intervenor allows that "[t]he <u>CACI, Inc.-Federal</u> decision technically affects [sic] the Court's analysis of the Government's and ProVation's motions to dismiss, but <u>CACI, Inc.-Federal</u> does not change the result—Utech's Complaint can and should be dismissed for lack of 'statutory standing' but it should be done so under RCFC 12(b)(6)." (alterations added). Intervenor suggests

the Court should simply analyze the Government's and ProVation's motions under RCFC 12(b)(6) for failure to state a claim.  The Federal Circuit's ruling changes merely the procedural mechanism; it does not change the test for "statutory standing" or otherwise foreclose the ability (or obligation) for the Court to dismiss for want of "statutory standing."  There is no prejudice to Utech in doing so as it had a full and fair opportunity to respond to the arguments (including supplemental briefing).  And, in any event, this Court "may dismiss <u>sua sponte</u> under Rule 12(b)(6), provided that the pleadings sufficiently evidence a basis for that action."  <u>Anaheim Gardens v. United States</u>, 444 F.3d 1309, 1315 (Fed. Cir. 2006).

In response, protestor argues "the dismissal arguments of the Defendant and the Intervenor have simply collapsed, and this procurement protest must be decided on its merits." Protestor claims:

Note, first, that the Federal Circuit's holding completely refutes much of the arguments made by both the Defendant and the Intervenor in their motions to dismiss this procurement protest. Both motions are expressly entitled "Motion to Dismiss pursuant to Rule[] 12(b)(1)," the subject-matter

17

jurisdiction rule [and, in the case of the Intervenor, Rule 12(b)(6)]. The Defendant now concedes that its motion to dismiss "was framed as a jurisdictional challenge." Dkt. No. 31 at 4. Since statutory standing is no longer jurisdictional, per CACI, a motion to dismiss for lack of subject-matter jurisdiction, based on statutory standing, must be denied.

(alteration in original; footnote omitted).

In its reply brief, defendant contends

The merit of our argument and the underlying authority showing Utech lacks standing has not changed, and we have not stated otherwise. See Def. Supp. at 6 ("Nothing in CACI casts doubt on the precedent we relied on to show that Utech, a non-bidder, lacks standing."). The only meaningful change after CACI, as it relates to this case, is the procedural form for dismissing Utech's claim. While Utech also attempts to reargue that it qualifies as "prospective bidder," it cites nothing in CACI supporting that argument or showing that CACI changed the law on the meaning of "prospective bidder," see Pl. Supp. at 6–7—an issue already briefed by the parties. See ECF Nos. 14, 23. In short, CACI is no help to Utech here.

(footnote omitted).

Defendant's motion to dismiss was styled as: "This Court lacks jurisdiction over the complaint because Utech is not an 'Interested Party' and therefore lacks standing," and "in the alternative, this Court should dismiss Count One for failure to state a claim because Utech waived its objection to the terms of the Solicitation." Intervenor's motion to dismiss alleged "Utech is not an actual or prospective offeror and therefore lacks standing to assert Counts II and III," and "Utech's Count I and Count III should be dismissed under RCFC 12(b)(6) because Utech failed to protest before the close of bidding."[5] The defendant's motion to dismiss included a section regarding the "standard of review for motion to dismiss under RCFC 12(b)(1) & 12(b)(6)," and intervenor's motion to dismiss, under the heading "Legal Standard," argued: "A complaint should independently be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002)."

Despite the foregoing, protestor argues, addressing the defendant's arguments, "[t]he Defendant blithely assumes that it has made out a case for RCFC 12(b)(6) dismissal, Dkt. No. 41 at 4 -- even though it chose not to characterize its motion to dismiss

---

[5] The court addresses the arguments for failure to state a claim for protestor's alleged waiver below.

as such – without even addressing the standards for RCFC 12(b)(6) dismissal." (alteration added).[6]

This court may consider a motion to dismiss for lack of subject matter jurisdiction as one for failure to state a claim. As explained by another Judge of the United States Court of Federal Claims:

> The court therefore in its discretion converts defendant's jurisdictional motion into a motion to dismiss pursuant to RCFC 12(b)(6), despite the fact that defendant did not move on this alternative ground in the body of its motion and docketed its motion as only a motion to dismiss pursuant to RCFC 12(b)(1). Both parties have had the opportunity to be heard regarding defendant's alternative request for dismissal under RCFC 12(b)(6) and converting the motion will not prejudice either party. See Brown[ v. United States], 22 F.4th [1008,] 1011-12 [Fed. Cir. 2022)] (affirming dismissal for failure to meet [26 U.S.C.] § 7422(a)'s "duly filed" requirement under 12(b)(6) rather than 12(b)(1)); Roberson v. United States, 115 Fed. Cl. 234, 240-41 (2014) ("In its discretion, the court may convert defendant's motion into a RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted" so long as both parties had the opportunity to be heard regarding dismissal on this ground); Peninsula Grp. Cap. Corp. v. United States, 93 Fed. Cl. 720, 727 (2010) (holding that although defendant had "only brought a motion to dismiss for lack of jurisdiction," the court may "construe[ ] [the motion] as one for failure to state a claim upon which relief can be granted," where the "critical issue . . . remains the same and has been fully briefed by the parties").

Vensure Hr, Inc. v. United States, 164 Fed. Cl. 276, 284 (2023) (first four alterations added; footnote and internal reference omitted). As explained by a different Judge of this court in Roberson v. United States, 115 Fed. Cl. 234, cited in the Vensure decision:

> Defendant has moved to dismiss all of plaintiff's claims pursuant to RCFC 12(b)(1). However, as discussed more fully below, the court clearly has jurisdiction over some of the causes of action alleged in the complaint and cannot dismiss them pursuant to RCFC 12(b)(1). In its discretion, the court may convert defendant's motion into a RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Bryce v. Episcopal Church in the Diocese of Colo., 289 F.3d 648, 654 (10th Cir.2002) ("The crucial element is the subject of the motion, not whether it is labeled a Rule 12(b)(1) motion rather than a 12(b)(6)."); Fraternal Order of Police, Nat'l Labor Council, USPS No. 2 v. U.S. Postal Serv., 988 F. Supp. 701, 704 n. 2 (S.D.N.Y.1997) (converting a motion to dismiss for lack of jurisdiction to a motion to dismiss for failure to state a claim after finding there would be no

---

[6] Protestor also addresses the defendant's and intervenor's arguments, arguing that the "dismissal arguments of the Defendant and the Intervenor have simply collapsed, and this procurement protest must be decided on its merits."

prejudice to either party, given that both parties had an opportunity to be heard and brief whether they had stated a claim); see also W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 348 (1997) (noting that sua sponte dismissal on RCFC 12(b) grounds is appropriate where "the parties were provided ample notice and opportunity to be heard").

Roberson v. United States, 115 Fed. Cl. 234, 240–41 (2014). The parties in the above captioned bid protest had a full opportunity to brief the issues regarding whether protestor was an interested party and whether protestor had standing to bring a protest in this court after protestor did not submit a proposal in response to the Solicitation. The court gave all parties an additional chance to address the merits of standing and the interested party standard at oral argument after the motions to dismiss were fully briefed. All parties had a final opportunity to brief the issues in the supplemental briefings, and as noted by defendant, protestor made arguments regarding its qualifications as a "prospective bidder" after the CACI decision. Protestor will not be prejudiced by the court considering the standing issue as a failure to state a claim instead of a lack of subject matter jurisdiction.[7]

---

[7] Recently in CeleraPro, LLC v. United States, a Judge of the United States Court of Federal Claims stated:

> Defendant moves to dismiss this matter under Rule 12(b)(1). However, in view of CACI, both parties agree that the Court may sua sponte convert the Defendant's Motion to Dismiss from 12(b)(1) to 12(b)(6); see Anaheim Gardens v. United States, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss sua sponte under Rule 12(b)(6)."); Bitscopic, Inc. v. United States, 166 Fed. Cl. 677, 696 (2023) (citing Brown v. United States, 22 F.4th 1008, 1011–12 (Fed. Cir. 2022); Vensure Hr, Inc. v. United States, 164 Fed. Cl. 276, 284 (2023); Roberson v. United States, 115 Fed. Cl. 234, 241 (2014) ("This Court may . . . convert a motion to dismiss under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6), particularly where, as here, the parties have an opportunity to be heard regarding the alternative ground for dismissal.")). Accordingly, and on consent of the parties, this Court analyzes Defendant's Motion to Dismiss under Rule 12(b)(6).

CeleraPro, LLC v. United States, 168 Fed. Cl. at 419 (internal references and footnote omitted; ellipses in original). Likewise, the same Judge of this court explained:

> The Federal Circuit has suggested that "motions to dismiss based on 'statutory standing' defects are properly brought under Rule 12(b)(6) rather than Rule 12(b)(1) in recognition of the fact that such defects are not jurisdictional." Lone Star Silicon Innovations LLC v. Nanya Tech. Corp., 925 F.3d 1225, 1235 (Fed. Cir. 2019). This is because the phrase "statutory standing" refers to "a plaintiff's right to pursue a cause of action." John Wiley & Sons, Inc. v. DRK Photo, 882 F.3d 394, 402 n.4 (2d Cir. 2018); see also Lexmark, 572 U.S. at 128 n.4, 134 S. Ct. 1377 (explaining the "statutory

Additionally, in the protest currently before the court, this court agrees with defendant and the intervenor that the court may make a decision on standing without remanding to the contracting officer for an initial decision as defendant's and intervenor's standing challenges stem from protestor's failure to submit a bid to the VA or file a protest before the close of bidding. Further, as quoted above, defendant agues

> in <u>CACI</u>, the Claims Court was confronted with a challenge to the contracting officer's determination that CACI's bid had qualifying deficiencies. <u>See</u> <u>CACI</u>, 67 F.4th at 1152. Utech made no such challenge here. Nor could it, because Utech never submitted a bid and was not an actual or prospective bidder. Thus, unlike in <u>CACI</u>, where the "merits issue to a bidder's qualifications" overlapped with the statutory standing issue, <u>CACI</u>, 67 F.4th at 1152, there is no such overlap here.

(internal reference omitted). Therefore, consistent with the Federal Circuit's <u>CACI</u> decision, this court, <u>sua</u> <u>sponte</u>, considers defendant's motion to dismiss on standing grounds and intervenor's motion to dismiss on standing grounds as motions to dismiss for failure to state a claim. <u>See</u> <u>Vensure Hr, Inc. v. United States</u>, 164 Fed. Cl. at 284; <u>Roberson v. United States</u>, 115 Fed. Cl. at 240-41.

Consistent with foregoing, in the protest currently before the court, defendant argues that "Utech is not an 'interested party' and therefore lacks standing." Defendant contends "Utech neither bid on the challenged solicitation nor filed a protest before the date to submit proposals passed. Well-settled precedent establishes that, under such circumstances, Utech is not an 'interested party' and therefore has no standing to protest the award at issue." Defendant asserts that "Utech acknowledges that it 'examined the Solicitation when it was issued,' and apparently concluded that receiving the award was 'unlikely' and declined to submit a bid during the proposal period. Under these circumstances, <u>Rex Service[ Corp. v. United States</u>, 448 F.3d 1305 (Fed. Cir. 2006)] controls." (internal references and footnote omitted; alteration added). Intervenor agrees with defendant, and quoting <u>Rex Service Corp. v. United States</u>, 448 F.3d at 1307, argues

---

> standing" inquiry asks whether the plaintiff "has a cause of action"). Therefore, a motion to dismiss on the grounds that the protestor lacks statutory standing under 28 U.S.C. § 1491(b)(1) must be considered under Rule 12(b)(6). <u>Lone Star</u>, 925 F.3d at 1235; <u>CACI</u>, 67 F.4th at 1151. Furthermore, "[t]he trial court may dismiss *sua sponte* under Rule 12(b)(6)." <u>Anaheim Gardens v. United States</u>, 444 F.3d 1309, 1315 (Fed. Cir. 2006). This Court may therefore convert a motion to dismiss under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6), particularly where, as here, the parties have an opportunity to be heard regarding the alternative ground for dismissal. <u>See</u> <u>Brown v. United States</u>, 22 F.4th 1008, 1011–12 (Fed. Cir. 2022); <u>Vensure Hr, Inc. v. United States</u>, 164 Fed. Cl. 276, 284 (2023); <u>Roberson v. United States</u>, 115 Fed. Cl. 234, 241 (2014).

<u>Bitscopic, Inc. v. United States</u>, 166 Fed. Cl. 677, 696 (2023) (emphasis in original).

that "where a party 'could have bid, but chose not to, it cannot be considered a prospective bidder.'"

Although conceding protestor did not submit a proposal before the Solicitation's February 16, 2021 due date for proposals, protestor argues that there are "substantial (and, we submit, dispositive) differences between this case and the Rex[ Service Corp. v. United States, 448 F.3d 1305] case." (alteration added). Protestor argues that unlike in Rex, protestor chose to submit a proposal "as a subcontractor to Namtek, rather than a prime contractor," even though protestor represents that it did not know about the debarment of Namtek Corp. Second, protestor argues that "Utech, unlike Rex, is raising issues that Utech raised earlier by protest, in both Utech's agency-level protest and Utech's GAO protest." Next, protestor argues that

> Utech, unlike Rex, has, in fact, alleged that it was "prevented from bidding" by the basis of its protest. For instance, the Complaint alleges that if the Solicitation had advised offerors that integration with Cerner would be evaluated, this would have caused Utech to submit a proposal, because Utech is engaged in integration with Cerner, and Namtek was not.

In Rex Service Corp. v. United States, 448 F.3d 1305, the United States Court of Appeals for the Federal Circuit explained:

> In July 2003, the Defense Supply Center, Columbus, a subagency within the Department of Defense, issued a request for proposals ("2003 RFP") to supply "thumbwheel switches," a component in aviation control transponders. At that time, Rex was the sole approved source for providing the component. On July 25, 2003, it filed an agency protest to the 2003 RFP, alleging that the department had disclosed some of Rex's proprietary data. After reviewing the RFP, the department concluded that no data contained in it was proprietary. Nevertheless, it canceled the 2003 solicitation.
>
> In September 2004, the department issued a second RFP for "thumbwheel switches." On November 2, 2004, one day before the close of bidding, Rex filed an agency protest to this RFP. The protest alleged that department violations of the Procurement Integrity Act, 41 U.S.C. § 423, had prejudiced Rex, but did not prevent it from bidding, and further argued that any company who submitted a proposal using data from the 2003 RFP should be disqualified from bidding. However, Rex did not submit a bid. In January 2005, the department denied the protest, and Rex did not pursue the matter further. In February 2005, a contract was awarded under the 2004 solicitation to Associated Aircraft Manufacturing and Sales, Inc. ("Associated"), who had become an approved source for "thumbwheel switches" prior to the close of the solicitation period.

Rex Serv. Corp. v. United States, 448 F.3d at 1306–07. In its analysis, the Federal Circuit determined:

> MCI held that "in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation." 878 F.2d at 365 (emphasis in original). Further, "the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends." Id. Here, because Rex could have bid, but chose not to, it cannot be considered a prospective bidder.
>
> It is not relevant to Rex's status that it filed a pre-award agency protest, or that it alleges department "illegalities" prejudiced its ability to bid. It "could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process." Fed. Data Corp. v. United States, 911 F.2d 699, 705 (Fed. Cir. 1990). Similarly, we reject Rex's argument that it was a prospective bidder because it was a named source for "thumbwheel switches" and supplied the department with those parts under other contracts. This may have influenced its business decision not to submit a bid, but cannot overcome the failure to meet the prospective bidder requirements of MCI. In the end, Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period, but was prevented from doing so on the basis of improper agency action. See generally MCI, 878 F.2d at 365.

Rex Serv. Corp. v. United States, 448 F.3d at 1308 (alterations and emphasis in original).

Consistent with the holding of Rex Service Corp. v. United States, defendant, quoting Rex Serv. Corp. v. United States, 448 F.3d at 1307, contends "because Utech 'did not bid,' it 'is not an "actual bidder."'" Nor, argues defendant, is "Utech a 'prospective bidder,' for it did not 'file a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period.'" The court agrees. Additionally, the court sees no basis for protestor's claim that "Utech, unlike Rex, has, in fact, alleged that it was 'prevented from bidding'" on the Solicitation at issue because protestor affirmatively made the decision not to submit a proposal in response to the Solicitation as a prime contractor. Protestor's decision not to further investigate the scope of the Solicitation does not demonstrate that protestor was "prevented from bidding." Although protestor contends "Utech, unlike Rex, is raising issues that Utech raised earlier by protest, in both Utech's agency-level protest and Utech's GAO protest," the Federal Circuit in Rex Service Corp. v. United States, quoted directly above, held:

> It is not relevant to Rex's status that it filed a pre-award agency protest, or that it alleges department "illegalities" prejudiced its ability to bid. It "could have [bid] for the contract award . . . and could have utilized the protest

procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process."

See id. at 1308 (alterations and omission in original).

To differentiate the protest now before the court from the holding in Rex, protestor argues unlike the protestor in Rex Service Corp., the current protestor chose to submit a proposal "as a subcontractor to Namtek, rather than a prime contractor." As noted by defendant, "[a]lthough Utech suggests in a footnote that it is a 'prospective bidder' because it would submit a proposal *if* the Solicitation were reopened, this argument was explicitly rejected by the Federal Circuit." (emphasis in original; alteration added; internal reference omitted).

In MCI Telecommunications Corp. v. United States, 878 F.2d 362, referenced above in Rex Service Corp., the Federal Circuit explained:

On January 7, 1987, the General Services Administration (GSA) issued a request for proposals from contractors interested in providing telecommunications services for either of the networks to comprise the Federal Telecommunications System (FTS) 2000. The FTS 2000 networks are intended to provide the federal government with switched voice, switched data, packet switched, video transmission, switched digital integrated, and dedicated transmission telecommunications services for a ten year contract period. In response to the solicitation, AT & T Communications, Inc. (AT & T), Martin Marietta Corporation (MMC), and US Sprint Communications Company (US Sprint) submitted proposals. MCI, the would-be protestor in this case, did not participate in the bidding process. That is, although it did become a major subcontractor under MMC's proposal, it did not itself submit its own proposal at any time during the proposal period.

After reviewing the proposals which were submitted, the GSA, on December 7, 1988, awarded the contract for one of the FTS 2000 networks to AT & T, and for the other to US Sprint. Believing that AT & T's proposal failed to conform with material, mandatory requirements of the solicitation, and that the GSA, after awarding that contract to AT & T, impermissibly waived mandatory contract requirements rather than resolicit the contract, MCI sought to challenge the award of the contract by bringing a protest before the GSA board. The Competition in Contracting Act, 40 U.S.C. § 759 (Supp. V 1987), specifically subsection (f), provides for the board's resolution of bid protests for the type of automatic data processing equipment needed for the FTS 2000 networks.

MCI Telecommunications Corp. v. United States, 878 F.2d 3 at 363-64. When interpreting the Competition in Contracting Act, the Federal Circuit reasoned:

The language of section 759(f)(9)(B) plainly establishes, by use of the word "prospective," that, in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation. After the date for submission of proposals has passed, however, the would-be protestor can no longer realistically expect to submit a bid on the proposed contract, and, therefore, cannot achieve prospective bidderhood with regard to the original solicitation. This is equally true whether the would-be protestor missed the deadline because it negligently failed to file a proposal, or, as here, because it deliberately chose to be only a subcontractor and not to submit its own proposal.

MCI Telecommunications Corp. v. United States, 878 F.2d at 365 (emphasis in original). Therefore, the Federal Circuit in MCI concluded:

Since the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends, MCI's stated intention to submit a proposal in response to any resolicitation, and its efforts to secure resolicitation by filing a protest, can do nothing to create the necessary interested party status. By the close of the proposal period, MCI had placed itself outside the boundaries of interested party status. That is where it must remain unless, owing to the acts of an interested party which actually submitted a proposal or filed a timely protest, a resolicitation results. Nothing later proven could alter the fact that MCI did not act on time to become an interested party with regard to the solicitation; since, at this point, that is the only solicitation that ever was, nothing alters the fact that MCI was not an actual or prospective bidder and, therefore, is not an interested party.

Id.; see also Shamrock Foods Co. v. United States, 92 Fed. Cl. 339, 345 (2013). The Federal Circuit's decision in MCI makes plain that relying on a subcontractor does not qualify protestor as an interested party. Further, as correctly noted by defendant, "[t]he logic from MCI applies here: through its own inaction, Utech lost its opportunity to qualify as a prospective bidder—and its potential 'interested party' status—when the proposal period ended in February 2021." (alteration added).

In sum, consistent with MCI and Rex Service Corp., protestor has not demonstrated it was an actual or prospective bidder because, although potentially capable, the protestor before this court chose not to submit a proposal in response to the Solicitation, and. See Rex Service Corp. v. United States, 448 F.3d at 1308 ("Here, because Rex could have bid, but chose not to, it cannot be considered a prospective bidder."); see also MCI Telecommunications Corp. v. United States, 878 F.2d at 365.

Protestor tries to cite a litany of cases purporting to demonstrate standing in situations in which an offeror chose not to submit a proposal. Protestor argues that there are situations in which "a would-be offeror and subcontractor offeror qualifies as an 'interested party' under the Tucker Act." Protestor first cites to Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001), in which the

United States Court of Appeals for the Federal Circuit found that a protestor was an interested party, despite having been excluded from the procurement, because

> if appellant's bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and appellant could compete for the contract once again. Under these circumstances, the appellant has a "substantial chance" of receiving the award and an economic interest and has standing to challenge the award.

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1334. Protestor argues that "[h]ere, as well, Utech has made claims that would result in the agency's being 'obligated to rebid the contract, and [Utech] could then compete for the contract. Therefore, under Impresa, Utech is an interested party." (alterations in protestor's brief).

Unlike the protestor in the above captioned bid protest, however, the protestor in Impresa Construzioni Geom. Domenico Garufi v. United States, actually submitted a proposal, but was excluded from the competitive range by the contracting officer. See id. at 1329. The United States Court of Appeals for the Federal Circuit explained:

> Upon initial evaluation by a technical board and a price board, one of the competitors was eliminated from the competitive range by the contracting officer, leaving appellant Garufi, JVC, and one other bidder. After issuance of several reports, and numerous letters and meetings between Garufi and the boards, Garufi revised its proposal. The contracting officer then eliminated Garufi from the competitive range "based on the determination of the [technical board] that its revised technical proposals was [sic] rated UNACCEPTABLE overall" and "that a complete rewrite would be required to make the [proposal] acceptable. Moreover, the contracting officer stated that it was concerned "that [Garufi] may either not fully understand the complete solicitation requirements or be placing itself at an increased performance risk by its proposed prices being 25% below the [government estimate]." The contracting officer also eliminated the other remaining bidder, leaving JVC as the sole remaining bidder in the competitive range.

Id. (capitalization and alterations in original). Notably, the Federal Circuit in Impresa Construzioni Geom. Domenico Garufi v. United States also drew a contrast between the Impresa case and the MCI case, noting, "[t]his case is unlike other cases where we have found that (1) a contractor that did not submit a proposal did not have an economic interest, see, e.g., MCI Telecommunications Corp. v. United States, 878 F.2d 362 (Fed. Cir. 1989). . . ." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1329 (internal citations omitted; alterations added).

Protestor also claims that "[t]he next important – indeed, seminal – decision by the Federal Circuit regarding who is an 'interested party' under the Tucker Act is one that

neither the Defendant nor the Intervenor cites, *i.e.,* Distributed Solutions, Inc. v. United States, 539 F.3d 1340 (Fed. Cir.), reh'g denied (Fed. Cir. 2008)." (emphasis in original; alteration added). As explained by the Federal Circuit in Distributed Solutions: "In June 2005, the government, assisted by SRA [SRA International, Inc.], developed and issued a Request for Information (June RFI) soliciting software vendor responses," id. at 1342 (alteration added), and "SRA, with approval from the government, selected and awarded subcontracts to vendors providing the necessary software," but chose not to award subcontracts to two vendors which had responded to the June RFI. See id. at 1343. The two vendors filed a protest in which they contested "the government's decision to task SRA with awarding subcontracts for the purchase of software instead of procuring the software itself through a direct competitive process." Id. at 1344. The Federal Circuit determined:

> Assuming that the June RFI was part of the challenged procurement process, the contractors have established themselves as prospective bidders in that they submitted qualifying proposals in response and, according to their complaint, were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued. The contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete for the provision of acquisition and assistance solutions for JAAMS [Joint Acquisition and Assistance Management System program].

Id. at 1344-45 (internal citations omitted; alteration added). In the above captioned protest, however, protestor made the business decision not to submit a proposal and did not take steps to submit a proposal.

Protestor also cites to CGI Federal Inc. v. United States, 779 F.3d 1346 (Fed. Cir. 2015), in which, according to protestor:

> [T]he Federal Circuit held that protests preceding federal court litigation suffice to establish status as an actual or prospective bidder. CGI was not a bidder, but it did file a GAO protest, followed by a protest at the Court of Federal Claims. The Federal Circuit held that the GAO protest conferred "prospective bidder" status on CGI.

(alteration added). Further, according to protestor, the Federal Circuit in CGI Federal Inc. v. United States, held that a protestor had standing even when it did not submit a proposal because its GAO protest was "timely." In the protest currently before the court, protestor argues that, similar to the protestor in CGI, protestor submitted timely protests to the agency and to the GAO, which preserved its status as an "interested party."

In CGI, the United States Department of Health and Human Service's Centers for Medicare and Medicaid Services issued requests for quotes in order to issue contracts that would use the awardees to determine if Medicare claims had been correctly paid.

See CGI Fed., Inc. v. United States, 779 F.3d at 1347. The Federal Circuit indicated if the contractor identified an overpayment, the agency would send a demand letter to the provider and repayment, and then pay the contractor a contingency fee. See id. In CGI, CGI protested the payment terms of the requests for quotes, contending that the terms violated certain statutory and regulatory provisions. See id. As noted by the Federal Circuit:

> Five different contractors bid on the 2014 RFQs, but CGI did not. Instead, before bidding closed, CGI filed a timely pre-award protest at the Government Accountability Office ("GAO") challenging the revised payment terms. While the GAO protest was pending, the bidding period closed. The GAO subsequently denied the protest. Three business days later, CGI filed a protest in the United States Court of Federal Claims.

Id. at 1348. In CGI, the Federal Circuit recognized that protestor CGI "never submitted a bid in response to the 2014 RFQs and thus is not an actual bidder. CGI must therefore show that it was a prospective bidder at the time it filed its protest in the Court of Federal Claims. We hold that it has made such a showing." Id. In CGI, the Federal Circuit explained:

> CGI was a prospective bidder when it promptly initiated and diligently pressed its protest in the GAO forum, which Congress has encouraged protestors to use before suing in court. Unsuccessful in the GAO, it immediately filed for relief in court. We do not think that Congress meant for a protestor in CGI's position to lose its entitlement to sue just because delays engendered by the GAO adjudicatory process pushed completion past the closing date for bid submissions. Concluding, as we do, that CGI filed a protest prior to the close of bidding and thereby established its prospective bidder status, and that CGI thereafter diligently pursued its rights, CGI has prospective bidder status to pursue its Court of Federal Claims protest.

Id. at 1351. Furthermore, in CGI, the Federal Circuit determined that "CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was continuously pursuing its challenge to the payment terms in the 2014 RFQs." Id. at 1350 (footnote omitted). In the above captioned protest, however, the protestor before this court did not file its protest at the agency, and subsequently at the GAO, until approximately one year after the Solicitation's stated deadline for proposals, and, unlike the protestor in CGI, was not diligently pursing its protest challenge.

Protestor also cites to Acetris Health, LLC v. United States, 949 F.3d 719 (Fed. Cir. 2020), in which the Federal Circuit held that the protestor was an "interested party" because a particular procurement, on which the protestor did not bid, "would exclude Acetris from future procurements for other products on which it is a likely bidder." See id. at 727. Defendant correctly notes: "In Acetris Health, LLC v. United States, the protestor not only 'submitted an offer in response' to the solicitation, but also filed suit in the [United

States Court of Federal] Claims before doing so," (alterations added), unlike the protestor in the protest currently before this court. Based on the above discussion, this court concludes that protestor has not provided a basis in the protest currently before this court to be considered an interested party and to have standing to bring the above captioned protest. This court agrees with defendant that, given the facts of the protest currently before the court, "Utech cites no authority establishing that it is an 'interested party' with standing to bring Counts II and III."

Cardinal Change

In its complaint, protestor alleges "the contract cannot be altered, after award, in a manner that would represent an out-of-scope or 'cardinal' change." Defendant responds that "Utech's insufficiently pled 'cardinal' change claim (*Count I*) cannot provide this Court with jurisdiction." (emphasis in original). Defendant contends "to prevail on its 'cardinal' change theory, at a minimum, Utech must show that (1) there was a modification and (2) the modification 'materially departed' from the scope of the original procurement."[8] Defendant continues:

> The crux of Utech's conclusory allegations here, however, is [sic] that the VA decided to "characterize the contract" as a "universal and exclusive throughout the VA health system" instead of limiting it to "24 medical centers," which, according to Utech, is contrary to the terms of the Solicitation. But Utech alleges no facts that arguably support a conclusion that defendant modified the Solicitation in a way that "materially departs" from its original terms. Indeed, in the complaint, Utech identifies *no* amendments to the Solicitation; *no* terms that purportedly changed; *no* "new work" that has purportedly been undertaken because of this so-called change; and *no* "task orders" placed under the contract. Utech does not even attach the Solicitation to its complaint, much less cite specific provisions showing the Solicitation was somehow limited to "24 medical centers."

(emphasis in original; internal references omitted; alteration added). Defendant represents that there were no amendments or modifications that changed the Solicitation to one that was "universal and exclusive throughout the VA health system," as argued by protestor.

Assuming for the sake of argument that protestor could establish standing, defendant argues, "[e]ven accepting Utech's untenable reading of the Solicitation, Utech's

---

[8] The court notes that the standard for a cardinal change under Federal Circuit precedent is when "'the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for.'" Krygoski Constr. v. United States, 94 F.3d 1537, 1543 (1996) (AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1993)); see also Distrib. Sols., Inc. v. United States, 539 F.3d at 1346.

basis for contending that a change occurred is entirely conclusory." (alteration added). Protestor's complaint states:

> EndoSoft representatives were onsite at a VA location that employs the EndoSoft endoscopy information under an existing contract. This VA location had been planning to upgrade with EndoSoft software, including new functionality. The EndoSoft representatives were informed that the VA had issued guidance not to proceed with the purchase, due to an impeding [sic] decision on the "national" contract. This is a clear reference to the Solicitation (even though there was no award until six months later). This was repeated by e-mail to EndoSoft from a VA health center today.

(alteration added). Defendant argues

> even if some VA location decided not to move forward with this upgrade, that does not plausibly show that the VA has departed from the terms of the original Solicitation, and Utech fails to plead factual support showing otherwise. Viewed another way, even if the Solicitation were limited to 24 medical centers, as Utech suggests, this conclusory assertion about certain unidentified "guidance" does not plausibly show that the VA has exceeded the scope of the Solicitation or that the VA is doing more than administering the contract it has entered with Provation.

> Protestor responds that

> [i]t is difficult to rebut this argument squarely, because it is difficult to understand it. Count I alleges that this procurement veered off-course because the VA now is including numerous VA locations that were not solicited, where Utech (inter alia) is the incumbent service provider. Count I cites specific parts of the Solicitation from which this claim is derived.

(alteration added). Defendant argues, "[e]ven putting aside that Utech's brief does not identify what those 'specific parts' of its complaint are, these supposed references to the Solicitation itself cannot show that there has been a subsequent *change*. In fact, Utech's response is so thin that it *does not even mention* the term 'cardinal change' in its brief." (alteration added; emphasis in original). Notably, the only two mentions of cardinal change in protestor's bid protest complaint were, as quoted above, protestor's allegation that "the contract cannot be altered, after award, in a manner that would represent an out-of-scope or "cardinal" change," and its argument in Count I that

> [t]he agency decision to characterize the contract here as universal and exclusive throughout the VA health system for endoscopy information system requirements, is arbitrary and capricious, an abuse of discretion, and contrary to procurement law, because it is (a) contrary to the terms of the Solicitation, or (b) a change so substantial as to require re-solicitation, or (c) an out-of-scope or "cardinal" change.

(alteration added). Protestor has not provided support for its claims that the agency did not follow the requirements of the Solicitation.

Defendant also argues that the issue before the court is "whether Utech has plausibly stated a violation in the first place. Defendant submits it has not, and Utech's misguided arguments do not show otherwise." The court agrees that protestor's allegations are insufficient to raise or support a cardinal change allegation.

Waiver

Defendant further argues this Court should dismiss Count One for failure to state a claim because Utech waived its objection to the terms of the Solicitation" citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308. Intervenor argues that "Utech's Count I and Count III should be dismissed under RCFC 12(b)(6) because Utech failed to protest before the close of bidding." According to defendant, it is

> [w]ell-settled precedent establishes that, given Utech's failure to act, it has no standing to protest the award at issue. And although Utech attempts to allege that the agency has changed the nature of the contract, Utech merely contests the terms of the original solicitation—a challenge Utech waived by failing to raise it before bidding closed.

(alteration added). Intervenor also argues that protestor waived its right to protest any alleged defect in the Solicitation and that "[m]isunderstanding the RFP does not permit a protestor to circumvent the Blue & Gold Fleet rule (much less do so by dressing up a solicitation ambiguity in the clothes of a 'cardinal change')." (alteration added).

In Blue & Gold, the United States Court of Appeals for the Federal Circuit addressed whether if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. The Federal Circuit noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the agency had made a contract award. See id. at 1311. In considering if the protestor had waited too long to challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Trillion ERP Venture Tech LLC v. United States, 161 Fed. Cl. 531, 542 (2022). In Blue & Gold, the Federal Circuit held:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of

the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (alteration in original); see also M.R. Pittman Grp., LLC v. United States, 68 F.4th 1275, 1283 (Fed. Cir. 2023) ("Blue & Gold requires that a party with the opportunity to object to the terms of a government solicitation containing a patent error must do so prior to the close of the bidding process or else it waives its ability to raise that objection in the Court of Federal Claims." (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313)); Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1380 (Fed. Cir. 2022) (citing Harmonia Holdings Grp., LLC v. United States, 20 F.4th 759, 766 (Fed. Cir. 2021) (citing Blue & Gold, Fleet, L.P. v. United States, 492 F.3d at 1313)); Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016); Trace Sys. Inc. v. United States, 165 Fed. Cl. 44, 62 (2023); Eagle Techs., Inc. v. United States, 163 Fed. Cl. 692, 706 (2022), appeal dismissed, No. 2023-1473, 2023 WL 2820095 (Fed. Cir. Apr. 7, 2023); Land Shark Shredding, LLC v. United States, 142 Fed. Cl. 301, 311 (2019); MSC Indus. Direct Co. v. United States, 140 Fed. Cl. 632, 641 (2018); Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in Blue and Gold Fleet thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (alteration added) (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original; alteration added).

The Federal Circuit also explained in Blue & Gold:

"It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)); see also Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014).

After the motions to dismiss in the above captioned protest were fully briefed, the United States Court of Appeals for the Federal Circuit issued the decision in M.R. Pittman Group, LLC v. United States, 68 F.4th 1275, addressing waiver under Blue & Gold. Similar to the Federal Circuit's decision in CACI, Inc.-Federal v. United States, 67 F.4th 1145, which, as described above, determined that statutory standing was not jurisdictional, the Federal Circuit in Pittman determined that

> the Blue & Gold waiver rule—which seeks to reduce inefficiencies by requiring an objection to a solicitation be made prior to the close of bidding—is more akin to a nonjurisdictional claims-processing rule since it "seeks to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." Henderson v. Shinseki, 562 U.S. 428, 435, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011).

M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1280. The Federal Circuit, therefore, concluded that "the waiver rule articulated in Blue & Gold is nonjurisdictional." M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1280.

In Pittman, M.R. Pittman Group protested "the United States Army Corps of Engineers' (USACE) award of a contract for the repair of pump units in Louisiana. The USACE issued Solicitation No. W912P820B0063 on December 21, 2020 for the repair of pump units at Wilkinson Canal Pump Station in Plaquemines Parish, Louisiana." Id. at 1277-78. The Federal Circuit in Pittman explained:

> The USACE posted the solicitation for the repair of these pump units on beta.SAM.gov, the government-wide point of entry providing electronic access to "[g]overnment business opportunities greater than $25,000." The webpage with the link to the solicitation noted, "**[t]his is a 100% Small Business Set Aside procurement.** All Small Business concerns representing itself as such . . . under NAICS Code: 811310 may submit offers." J.A. 2 (emphasis original); J.A. 256. The solicitation itself did not include a reference to NAICS Code 811310. It did, however, incorporate by reference Federal Acquisition Regulation (FAR) 52.219-6—titled "Notice Of Total Small Business Set-Aside"—which warns that "[o]ffers are solicited only from small business concerns," and "[a]ny award resulting from this solicitation will be made to a small business concern." J.A. 2–3; J.A. 61. Bids were due on January 20, 2021. M.R. Pittman submitted a bid on that date and was the lowest bidder out of the four companies that submitted bids. The USACE informed M.R. Pittman that the contract was set aside for a small business under NAICS Code 811310 and requested that M.R. Pittman update its NAICS code status. But M.R. Pittman did not qualify as a small business under NAICS Code 811310 and was thus ineligible for the award. The USACE then awarded the contract to J. Star Enterprise, Inc., a small business based in New Orleans, Louisiana.

On February 3, 2021, M.R. Pittman filed a bid protest with the Government Accountability Office (GAO). The crux of M.R. Pittman's protest was that the omission of NAICS code 811310 meant that the solicitation could not be treated as a set-aside for small business concerns. The GAO dismissed the protest after holding that M.R. Pittman failed to timely challenge the solicitation. M.R. Pittman then filed suit in the Court of Federal Claims along with a motion for a temporary restraining order and preliminary injunction (collectively, the motions for emergency relief or emergency motions). M.R. Pittman again argued that the omission of the relevant NAICS code meant that the solicitation could not be treated as a small business set-aside.

Id. at 1278 (alterations and emphasis in original; footnote omitted).

The Federal Circuit explained that trial court in Pittman "held that M.R. Pittman waived its protest grounds under the Blue & Gold waiver rule and that this waiver deprived the court of subject matter jurisdiction." M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1279.[9]

---

[9] The Federal Circuit provided an extensive summary of the procedural posture of the Pittman bid protest.

M.R. Pittman then filed suit in the Court of Federal Claims along with a motion for a temporary restraining order and preliminary injunction (collectively, the motions for emergency relief or emergency motions). M.R. Pittman again argued that the omission of the relevant NAICS code meant that the solicitation could not be treated as a small business set-aside. The trial court held an initial status conference to determine a schedule for the initial proceedings, including the motions for emergency relief. The government indicated that it intended to move to dismiss and was contemplating filing its response to the motions for emergency relief and a motion to dismiss in the same document. The government explained that combining the two documents made sense because "the discussion of the likelihood of success on the merits in our view largely collapses with actual success on the merits." J.A. 184 at Tr. 15:19–24. In order to accommodate the USACE's desire to have these pumps repaired as quickly as possible, the trial court decided to have separate briefing schedules for the emergency motions and the motion to dismiss. The Court explained that M.R. Pittman's deadline to respond to any motion to dismiss would be decided at the hearing for the emergency motions.

The government did in fact file a combined Motion to Dismiss and Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. The combined filing argued that, under Blue & Gold, Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), M.R. Pittman had waived its protest grounds by failing to raise the issue prior to the close of bidding. The combined filing did not make separate arguments on this issue for the motion to dismiss and response to the emergency motions.

On appeal in <u>Pittman</u>, the Federal Circuit indicated that

> M.R. Pittman argues that the trial court erred in dismissing the complaint on jurisdictional grounds because the <u>Blue & Gold</u> waiver rule does not implicate subject matter jurisdiction. M.R. Pittman argues that it is an "interested party" "objecting to the government's failure to award it the contract associated with the Solicitation," Appellant's Br. 30, and that the Court of Federal Claims has subject matter jurisdiction over M.R. Pittman's claims pursuant to 28 U.S.C. § 1491(b)(1). In its response, the government does not argue that <u>Blue & Gold</u> waiver is jurisdictional. Instead, the government argues that even if M.R. Pittman is correct about <u>Blue & Gold</u> waiver being nonjurisdictional, the trial court's error is harmless and dismissal would still be proper under RCFC 12(b)(6) for failure to state a claim. We agree that the waiver rule articulated in <u>Blue & Gold</u> is nonjurisdictional.

<u>M.R. Pittman Grp., LLC v. United States</u>, 68 F.4th at 1280; <u>see also</u> <u>ECC Int'l Constructors, LLC v. Sec'y of Army</u>, 79 F.4th 1364, 1378 n.12 (Fed. Cir. 2023) (explaining the <u>Pittman</u> decision held that "in the bid protest context that the <u>Blue & Gold</u> waiver rule requiring offerors to object to a patent error in a solicitation prior to its close is nonjurisdictional, even though 28 U.S.C. § 1491(b)(1) waives the government's sovereign immunity for bid protests"). As indicated above, the Federal Circuit concluded "that the Court of Federal Claims erred in holding that M.R. Pittman's failure to object to the

---

M.R. Pittman filed a Reply to the government's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. M.R. Pittman did not file a separate response to the motion to dismiss, as the trial court had not set a response brief deadline for the motion to dismiss. M.R. Pittman did, however, respond to the <u>Blue & Gold</u> waiver argument set out in the government's combined filing when it addressed the reasonable likelihood on the merits factor.

The Court of Federal Claims then held a hearing on the motions for emergency relief. The trial court confirmed that the hearing was not on the motion to dismiss. The court and parties discussed, quite extensively, whether M.R. Pittman had waived its grounds for protest under <u>Blue & Gold</u>. The court did not set a deadline for M.R. Pittman to respond to the motion to dismiss. Two weeks after the hearing, the trial court denied M.R. Pittman's motions for emergency relief and granted the government's motion to dismiss. The trial court found that it lacked subject matter jurisdiction under Rule 12(h)(3) of the Rules of the Court of Federal Claims (RCFC).

<u>M.R. Pittman Grp., LLC v. United States</u>, 68 F.4th at 1278–79.

solicitation before the close of bidding created a jurisdictional defect. The Court of Federal Claims did have jurisdiction over M.R. Pittman's claims under 28 U.S.C. § 1491(b)(1)." M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1280–81. The Federal Circuit also determined "the trial court did not commit reversible procedural error when it ruled on the government's motion to dismiss before M.R. Pittman filed a formal response to the motion. Nor was M.R. Pittman prejudiced by the fact that the administrative record had not been produced before the action was dismissed." M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1282–83. Therefore, the Federal Circuit in Pittman indicated, "[h]aving rejected M.R. Pittman's procedural arguments, we turn to its substantive arguments as to why Blue & Gold waiver is inapplicable in this case." M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1283 (alteration added).

In considering waiver under the Blue & Gold standard, the Federal Circuit in Pittman determined:

> As explained above, Blue & Gold requires that a party with the opportunity to object to the terms of a government solicitation containing a patent error must do so prior to the close of the bidding process or else it waives its ability to raise that objection in the Court of Federal Claims. 492 F.3d at 1313. That M.R. Pittman had the opportunity to, but did not, inquire about the missing NAICS code is undisputed. The dispute here lies in whether the missing NAICS code—when considered with the solicitation's webpage or the FAR provision incorporated in the solicitation—constituted a patent omission from the solicitation. If the omission is patent, then M.R. Pittman waived its protest ground by failing to object before the close of bidding. If the omission is latent, then M.R. Pittman can proceed with its bid protest. We conclude that the omission was patent.
>
> "Whether an ambiguity or defect is patent is an issue of law reviewed de novo." Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016). A defect in the solicitation is "patent" "if it is an obvious omission, inconsistency, or discrepancy of significance" or "if it could have been discovered by reasonable and customary care." Inserso Corp. v. United States, 961 F.3d 1343, 1349 (Fed. Cir. 2020). Furthermore, when interpreting a contract, the parties are charged with knowledge of law and fact appropriate to the subject matter. Turner Const. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004). Here, we agree with the trial court that the solicitation's incorporation of FAR 52.219-6—titled "Notice of Total Small Business Set-Aside"—and the statement of the solicitation's webpage that "[t]his is a 100% Small Business Set Aside procurement" with the relevant NAICS code renders the omission patent as a matter of law.

M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1283 (alteration in original). The Federal Circuit also determined that

the incorporation of a FAR clause created an ambiguity that a reasonably diligent contractor would seek to clarify. Therefore, the solicitation cannot be said to be "facially unambiguous." Moreover, M.R. Pittman's suggestion that extrinsic evidence can never be used to determine whether an ambiguity was patent to one of the contracting parties is wrong as a matter of law.

Id. at 1284.

The Federal Circuit in Pittman concluded:

In sum, we agree with the trial court that M.R. Pittman waived its protest grounds under the Blue & Gold waiver rule. We have considered M.R. Pittman's remaining arguments, but we find them unpersuasive. Accordingly, the judgment of the Court of Federal Claims is affirmed, albeit for failure to state a claim rather than for a lack of subject matter jurisdiction.

M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1284–85.

After the Pittman decision, the undersigned instructed all parties also to brief the impact of the Pittman decision on the above captioned bid protest and the analysis for waiver under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308. The defendant argues:

In holding that dismissal on Blue & Gold waiver grounds was proper under RCFC 12(b)(6), M.R. Pittman confirms that our motion to dismiss Count One in Utech's complaint based on Blue & Gold waiver was correctly brought pursuant to RCFC 12(b)(6). M.R. Pittman should therefore have no impact on this Court's analysis of our dismissal motion in that respect.

(internal reference omitted). Defendant also contends

like in M.R. Pittman, where the protester waived its challenge for failing to object despite a "glaring discrepancy" between the omitted NAICS Code and other provisions in the solicitation, Utech waived its claim here by failing to object despite glaring discrepancies between the Solicitation and its interpretation of the Solicitation. M.R. Pittman also confirms that a "reasonably diligent contractor" must "seek to clarify" any purported ambiguity or object to the terms "prior to the close of the bidding process," instead of sitting idle, as Utech did. See M.R. Pittman, 2023 WL 3573337 at **5–6. Moreover, contrary to Utech's assertion that the concern addressed in Blue & Gold "does not apply here" because Utech "has not lain in wait to see whether it wins award before raising its objection," Pl. Opp. Mot. Dismiss at 31, Utech did exactly what the Federal Circuit deemed improper in M.R. Pittman—it waited to object and thereby "left itself the ability" to later argue that the Solicitation was not limited to 24 sites, see M.R. Pittman, 2023 WL 3573337 at *7. M.R. Pittman thus also reaffirms that

Utech should not be permitted to benefit from waiting to object and that the purpose of <u>Blue & Gold</u> would be met by applying the waiver rule under these circumstances. <u>See</u> <u>id.</u>

Intervenor similarly argues "<u>M.R. Pittman Group</u> did not change the substance of the <u>Blue & Gold</u> waiver rule." Intervenor continues:

> The <u>M.R. Pittman Group</u> decision supports ProVation's motion to dismiss Counts I and III, under RCFC 12(b)(6) because the <u>Blue & Gold</u> waiver rule bars Utech's claims. Utech's claims rely on its misunderstandings about the plain meaning of the RFP. But Utech did not object or submit a pre-award protest (or even a proposal) before the proposal due date. "A party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." <u>Blue & Gold</u>, 492 F.3d at 1313. Dismissal of Utech's untimely claims is warranted under RCFC 12(b)(6)— <u>M.R. Pittman Group</u> does not change that conclusion.

(internal references omitted).

> Protestor responds that "[t]he direct consequence of the <u>Pittman</u> decision is that the Defendant and the Intervenor were, once again, wrong in arguing that their <u>Blue & Gold</u> arguments against the protestor here are jurisdictional, requiring dismissal." (alteration added). Protestor argues

> that <u>Pittman</u> involved a single issue that indisputably turned on an alleged impropriety in the solicitation, whether latent or patent; there was no preceding agency-level; and the GAO protest was (quite properly) dismissed as untimely (and therefore could not qualify as timely <u>Blue & Gold</u> prior notice to the agency). Here, in contrast, the Protestor has not alleged any impropriety in the solicitation, and here there were timely preceding agency-level and GAO protests. This is not a "glaring ambiguity" case like <u>Pittman</u>, but beyond that, <u>Blue & Gold</u> does not appear to be applicable to *any* of the issues presented by this protest.

(emphasis in original; footnotes omitted).

> The court agrees with the defendant and intervenor that their motions to dismiss on waiver grounds are properly filed as motions to dismiss for failure to state a claim, consistent with the Federal Circuit's holding in <u>Pittman</u>. <u>See</u> <u>M.R. Pittman Grp., LLC v. United States</u>, 68 F.4th at 1284–85. The court also agrees that the <u>Pittman</u> decision did not substantially change the <u>Blue & Gold</u> waiver analysis in the protest before this court, except the <u>Pittman</u> case made clear that a <u>Blue & Gold</u> waiver argument is not a ground to dismiss a bid protest for lack of subject matter jurisdiction. This court, therefore, examines the defendant's and intervenor's arguments that protestor has waived its

protest grounds under the <u>Blue & Gold</u> waiver rule in the context of a motion dismiss for failure to state a claim.

> Protestor's complaint alleges:
>
> EndoSoft [protestor] did not have the same motivation to submit a proposal that it certainly would have had, if the Solicitation had stated that it was universal in scope, supplanting existing contracts. Thus the Solicitation's "tiering," together with the Solicitation provisions limiting award to the 24 VA sites not already having endoscopy information system contracts led EndoSoft not to submit a proposal itself.

(footnotes and internal references omitted; alteration added). Protestor's complaint maintains:

> Under the Solicitation's Section 4.3, LEGACY DATA MIGRATION SERVICES, the specific requirement is to migrate existing endoscopy data from the Olympus EndoWorks system, which was discontinued by Olympus in 2018. This establishes, in effect, that this solicitation was limited only to facilities still using the Olympus EndoWorks system, and the numbers in the Solicitation (annual CLINs with a quantity of 24) confirm that.

(capitalization in original; footnote omitted). According to protestor:

> With the Solicitation, VA provided a list of all the VA's major medical facilities and their current endoscopy information system in use – *see* "Attachment 13 VA Endoscopy Procedures Facility List." The number of listed facilities using EndoWorks plus the number of facilities using "None-CPRS" is 27. (Where the hospitals are using None-CPRS, no migration of existing endoscopy data would be required.) Three of those facilities (VA Little Rock, VA Tampa and VA San Juan) all contracted with EndoSoft as this solicitation was being posted. Twenty-seven minus 3 is 24, which is consistent with the CLIN 'ask' for 24 medical centers to be served.

(emphasis in original). As indicated above, the Solicitation provided that "[t]he Veterans Health Administration (VHA) Equipment Life Cycle Management (ELCM) Program has identified Information System: Data Management: Endoscopy here after [sic] referred to as Endoscopy Information Systems (EIS) as a candidate for VA-wide (otherwise referred to as 'national') contract award." (alterations added). The Solicitation also explained that "[t]asks under this PD [product description] shall be performed at VHA facilities throughout the United States and all of its territories. Delivery requirements and specific locations shall be specified under each individual order." (alterations added). For price, the Solicitation required offerors to propose pricing for numerous CLINs listed in a "Cost/Price Schedule," and explained:

> This is a Requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

The foregoing statements in the Solicitation when read together indicate that the language of the Solicitation was not necessarily limited to the specific 24 facilities as protestor claims. Additionally, even referenced in protestor's complaint, at "Attachment 13 – VA Endoscopy Procedure," the Solicitation included a list of VA medical facilities throughout the United States, which identified the following information for each facility: "Facility Sub-District, VISN [Veterans Integrated Service Network], VISN #, Facility Number, City, State, Facility Name, Facility Address, Approximate # Rooms, Approximate # Travel Carts, Rough Estimate # Procedures, and Assumed Brand Currently In Use." (alteration added). Defendant argues, quoting Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985), this "alone should have alerted Utech that its restrictive view of the Solicitation was questionable and 'raise[d] the duty of inquiry, regardless of the reasonableness of [Utech's] interpretation.'" (alteration in defendant's brief). Defendant also argues:

> Utech cites nothing in the Solicitation that expressly or even implicitly states that the Solicitation is limited to 24 medical centers or "the number of enumerated facilities without existing contracts." Beyond that, Utech's rationale for landing on the number "24" is not only hard to follow, but also inconsistent with the Solicitation and its own allegations. First, Utech's allegations are internally inconsistent. Utech states that the provisions relating to "Legacy Data Migration Services" show that the Solicitation was "limited to only facilities still using the Olympus EndoWorks system." Yet the list of VA facilities in Attachment 13 to the Solicitation shows that the number of facilities using EndoWorks is nine, *not* 24. The next paragraph only adds to the confusion, as Utech alleges that the Solicitation "reads as applying to VA sites that are using 'None-CPRS' or EndoWorks only," which conflicts with its previous statement that the Solicitation was "limited to only facilities still using the Olympus Endoworks system." (emphasis in original). Worse yet, elsewhere, Utech alleges that the Solicitation is for an endoscopy information system in parts of the VA "that do not already have such a system," which seemingly would *exclude* locations with the EndoWorks system. These conflicting allegations sharply undercut Utech's reading of the Solicitation. Utech also states that its number "24" equals the total facilities "without existing contracts." But the number of facilities it identified—those "using EndoWorks plus [those] using 'None-CPRS'"—is 27.

(emphasis and alterations in defendant's brief; internal references and footnote omitted).

Protestor responds by simply asserting that "Utech has alleged that the Solicitation extends only to VA facilities using legacy systems, not to ones served by Utech (or other 'non-legacy' contractors). Utech has alleged that this was its actual understanding of the Solicitation when it was issued, and it is the Solicitation's plain meaning." Protestor continues: "There was nothing 'ambiguous' about the fact that the numbers assigned to the CLINs corresponded exactly to the number of VA service locations without a 'legacy' Endoscopy Information System contract." Protestor's counsel, unconvincingly, states:

> In order to try to create the appearance of such an ambiguity, the movants point to the fact that that Solicitation employed the word "national." But the 'National' [sic] Guard is found *across* the United States, not *everywhere in* the United States. The 'National' [sic] Archives and the 'National' [sic] Endowment for the Arts, and NASA, are *for* the United States, not *everywhere in* the United States. It is unreasonable for the movants to argue that the use of the term "national" meant universal and exclusive. (Furthermore, if there were some "ambiguity" on that score, it was not a "patent ambiguity," as addressed immediately below.) Therefore, the <u>Blue & Gold</u> time bar does not apply.

(emphasis in original; alterations added; internal reference omitted). Protestor also argues "[i]n this case, the movants never even claim that there *was* a Solicitation defect, much less that the defect at issue was 'apparent on the fact of the document' or that it was 'patent and glaring.'" (emphasis in original; alteration added). Protestor appears to be trying to argue that the framework from <u>Blue & Gold</u>, that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims," <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1313; <u>see</u> <u>also</u> <u>M.R. Pittman Grp., LLC v. United States</u>, 68 F.4th at 1280, does not apply in the above captioned protest because, according to protestor, there was no patent ambiguity in the Solicitation.

Both defendant and intervenor also point to the questions and answers provided by the VA in advance of the due date for the receipt of the proposals to demonstrate that the number of locations was not limited to 24 locations as argued by plaintiff. One question by a potential offeror asked the VA: "Since we represent a product different than the one listed in the CLINs, our offering isn't an apples to apples comparison, with regards to the CLINs. Questions: What do the quantities listed in the CLINs represent? Are we expected to match those quantities?" The VA responded:

> You should provide a proposal that meets the requirement for Twenty four (24) VA Facilities annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased. A brand name or equal product must be identified for each item listed in the price schedule. Proposed products must be either the brand name or be an equal to the brand listed on the Price Schedule. Changes to

the price cost schedule to meet your format is acceptable. However, the Offeror must clearly describe any modifications it plans to make to a product, or equal product, to make it conform to the solicitation requirements.

The VA also responded to the question: "CLIN 0004 indicates the price schedule is based off twenty-four (24) individual sites; however, CLIN 0001 only has a quantity of six (6). Will CPRS and VISTA image integration to include project management, implementation, installation, training, and support only be required at six (6) sites?" The VA answered: "CPRS and VISTA image integration to include project management, implementation, installation, training, and support is at twenty four (24) sites annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased." In response to the question: "How many sites is the cost price schedule based off?" the VA responded: "Twenty four (24) annually. The quantities provided are estimates only, and VA makes no guarantee regarding the actual quantities that may be purchased." As noted by defendant, "potential offerors *did* seek clarification from the VA regarding the scope of the facilities under the Solicitation," and "that the questions were even raised underscores that any purported inconsistency with Utech's view of the Solicitation was patent." (emphasis in original). As noted by a Judge of the United States Court of Federal Claims:

> An ambiguity in an RFP is generally patent if offerors seek clarification of the ambiguous provision prior to submitting their proposals. See Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312-13 (Fed. Cir. 2016) ("[T]he ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the two plausible interpretations indicated above. Following clarification during the question and answer period, the ambiguity was removed, and so there was at that time neither a patent nor a latent ambiguity."). Assuming that the RFP here contained some ambiguity regarding transition plans and costs, which is not how the court reads the RFP, the ambiguity was patent because it was repeatedly questioned by potential offerors.

Quanterion Sols., Inc. v. United States, 152 Fed. Cl. 434, 445 (2021) (alteration in original; internal reference omitted). Protestor does not address the questions and answers in its filings to the court. Moreover, the court finds that protestor did not meaningfully address if there was a patent ambiguity. As noted by intervenor,

> [d]espite these indications that the RFP was different from Utech's understanding, Utech does not allege that it filed a timely pre-award protest (or even asked a question of DVA [the United States Department of Veterans Affairs] regarding the scope of the RFP). Utech sat quietly—for more than a year. Utech's failure to raise the issue waives any right to protest, in this case, the scope or magnitude of the RFP.

(alterations added).

As articulated above by a Judge of the United States Court of Federal Claims: "The rule in Blue and Gold Fleet thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. at 737–38 (alteration added) (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381)). Under the circumstances presented in the above captioned protest, pursuant to Blue & Gold, if protestor was concerned about the Solicitation language, protestor should have sought to clarify with the agency in advance of the deadline to submit proposals, and the failure to do so results in the waiver of protestor's claims regarding the Solicitation before this court. In sum, protestor waived its protest grounds under the Blue & Gold waiver rule. See M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1284.

Separately, protestor raises a series of arguments that Blue & Gold does not apply in this protest. Protestor argues that it is not a bidder so Blue & Gold does not apply to protestor. Protestor does not cite to the Blue & Gold decision for this argument, but only cites the United States Court of Federal Claims case of Red River Communications, Inc. v. United States, 109 Fed. Cl. 497 (2013). Notably, protestor concedes that "the Court of Federal Claims decisions on this issue are not perfectly in line factually, but the clearest exposition is found in Red River Communications, Inc. v. United States, 109 Fed. Cl. 497 (2013), which established a categorical rule against applying Blue & Gold to non-bidders like Utech." The Judge in Red River explained:

> Blue & Gold Fleet's waiver rule is grounded in the statutory imperative that in bid protests "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*" Blue & Gold Fleet, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)). To that end, the Federal Circuit held that a waiver rule was appropriate because it "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." Id. at 1314. IDT [Infrastructure Def. Techs., LLC v. United States, 81 Fed. Cl. 375 (2008)] and Shamrock Foods [v. United States, 92 Fed. Cl. 339 (2013)] suggest that, in particular factual circumstances, those concerns apply equally when the protestor did not submit a bid in response to a solicitation. In both cases, crucially, the agency had given protestors full knowledge of the terms of the solicitation that would give rise to their challenges, just as it would have to a bidding or offering contractor. In both cases the danger of prejudice to the Government was the same as if the protestors had been disappointed offerors, *i.e.,* a protest would render moot the procurement efforts to date and potentially require expending more time and effort on a reprocurement. As the court pointed out in IDT, the waiver rule permits the Government an opportunity to address potential defects in a solicitation at an early stage in the procurement process, thereby avoiding wasted

procurement efforts. Similarly, the dangers of prejudice to other bidders were also present, whether to the awardee whose contract award would be in jeopardy, or to the disappointed bidders, the details of whose submissions might be revealed prior to reprocurement.

The key factor that emerges in <u>IDT</u> and <u>Shamrock Foods</u> is that it was uncontroverted that the agency had given notice directly to the protestors in those cases, so that it was readily apparent that they had full knowledge of the terms of the solicitations at issue and sufficient time and opportunity to raise objections before the deadline for proposal submissions. It is axiomatic that if a contractor has no knowledge of the terms of a solicitation, it should not be charged with the duty to bring any patent errors in that solicitation to the attention of the agency prior to the close of bidding. <u>See</u> <u>IDT</u>, 81 Fed. Cl. at 389 (citing <u>Knowledge Connections, Inc. v. United States</u>, 79 Fed. Cl. 750, 759 (2007) (declining to find waiver where protestor had no notice of the defect alleged prior to the close of the bidding period)).

What dissuades this court from endorsing a reading of <u>Blue & Gold Fleet</u> that would apply its waiver rule to non-offering contractors that on their own had acquired timely knowledge of the terms of the solicitation in issue is the same policy undergirding <u>Blue & Gold Fleet's</u> waiver rule, <u>viz.</u> "the need for expeditious resolution of the action." <u>See</u> 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)). It will not serve that need if a protest filed by a non-offering contractor becomes ensnared in an ancillary inquiry targeted to determining what the contractor knew about the solicitation and when it knew it, or whether the contractor chose the most effective means to bring the matter to the agency's attention. The case at bar illustrates the potential pitfalls of construing <u>Blue & Gold Fleet</u> to apply to non-offering contractors. Plaintiff, unlike the protestors in <u>IDT</u> and <u>Shamrock Foods</u>, was not invited to submit a proposal in response to the Solicitation.

<u>Red River Commc'ns, Inc. v. United States</u>, 109 Fed. Cl. at 509–10 (emphasis in original; alterations added). It is uncontested in the above captioned protest that protestor was aware of the Solicitation and made the conscious choice not to submit a proposal, and, therefore, <u>Red River</u> cuts against protestor's claim that a non-bidder is exempt from <u>Blue & Gold</u>. Moreover, the decision in <u>Shamrock Foods Co. v. United States</u>, 92 Fed. Cl. 339, cited above, and referenced in <u>Red River</u>, observed,

plaintiff suggests that the waiver rule has no application to a plaintiff who abstains from participating in a procurement and who files a protest after the award of a contract. In other words, waiver, in plaintiff's view, only occurs if "the contractor submitted a bid then waited to see if it would win before filing a protest." Unfortunately for plaintiff, there is no support for this limited view of the waiver rule in <u>Blue & Gold Fleet</u> or in cases interpreting the waiver rule. The unsurprising reason that the rule announced in <u>Blue & Gold Fleet</u> has been applied primarily to protestors who have submitted bids in

response to solicitations is that actual bidders are "interested parties" who have standing to bring post-award bid protests. See, e.g., Rex Service [Corp. v. United States], 448 F.3d at 1308 (noting that both actual and prospective bidders may have bid protest standing, but that "'the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends'" (quoting MCI [Telecommunications Corp. v. United States], 878 F.2d at 365)). The waiver rule in Blue & Gold Fleet clearly states that a challenge to the terms of a solicitation is untimely and waived if filed after the bidding period. 492 F.3d at 1315. Shamrock waived its right to object to the Supply Center's award of the back-up prime vendor contract work at Fort Bliss.

Shamrock Foods Co. v. United States, 92 Fed. Cl. at 345–46 (footnote and internal reference omitted; alterations added). The Judge in Shamrock Foods, in a footnote stated: "This court has noted that in the post-award bid protest context 'the case of waiver [under Blue & Gold Fleet precedent] is even stronger' for a non-bidder than a bidder.'" Shamrock Foods Co. v. United States, 92 Fed. Cl. 346 n.12 (alteration in original) (quoting Infrastructure Def. Techs., LLC v. United States, 81 Fed. Cl. 375, 389 (2008)).

Additionally, protestor argues the bidding process was not closed when Utech filed an agency level protest and a protest before the GAO, arguing:

The Defendant notes that proposals were due on February 16, 2021, but award was not made until 19 months later, on September 29, 2022. In the meantime, Utech protested both to the agency and then to the GAO. Defendant argues that Utech was required to protest before the proposals were due. That is not where the Federal Circuit drew the line in Blue & Gold, however; as quoted above, that court held that a protest must be filed before the "close of the bidding process," 492 F.3d at 1315, by which the Federal Circuit means, when award is made.

(internal reference omitted). Despite protestor's claims, Blue & Gold does not provide that waiver only occurs "when award is made." As noted by defendant, quoting from Blue & Gold, "as evident from the facts in Blue & Gold, the close of the bidding process means the 'closing date for the receipt of the proposals.'"

Protestor quotes from COMINT Systems Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012), to argue:

"To be sure, **where bringing the challenge prior to the award is not practicable, it may be brought thereafter**. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity **prior to the award of the contract**."

(all emphasis in protestor's brief). The court notes that the Federal Circuit held that the protestor in COMINT Systems Corp. failed to preserve its challenge. See id. Notably, in

COMINT Systems Corp., the protestor was challenging an amendment to the solicitation which was issued after the close of the proposal date, which was not the situation in the above captioned protest. The Federal Circuit in COMINT Systems Corp. explained:

> Comint points out that Blue & Gold's holding does not explicitly apply to this case since Comint had no opportunity to challenge the solicitation before "the close of the bidding process," Amendment 5 having been adopted after the bidding process closed. Amendment 5 was, however, adopted before the award, and we think the reasoning of Blue & Gold applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so.
>
> To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract. Here, Comint does not claim to have been unaware of the alleged defect in Amendment 5 prior to the award of the contract. Comint signed and returned its copy of the amendment to the agency, signaling its agreement with its terms. Amendment 5 issued on January 19, 2011. Comint signed the amendment on January 20, 2011. The agency did not award the contract until April 6, 2011. Here, Comint had two and a half months between the issuance of Amendment 5 and the award of the contract in which to file its protest. That was more than an adequate opportunity to object. Only now that the contracts have been awarded to other bidders does Comint seek to "restart the bidding process" by objecting to Amendment 5. See id. [Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1314.] This is precisely what Blue & Gold forbids.

COMINT Sys. Corp. v. United States, 700 F.3d at 1382–83 (footnote omitted; internal reference omitted; alteration added).

A Judge of the United States Court of Federal Claims addressed a similar argument by a protestor in Phoenix Management, Inc. v. United States, 125 Fed. Cl. 170 (2016). The Judge in Phoenix Management explained:

> The facts relevant to defendant's waiver argument are straightforward: (1) the Air Force issued the solicitation on February 18, 2015; (2) the proposal deadline was April 1, 2015; (3) in advance of the proposal deadline, the Air Force specifically addressed the absence of its "predetermined amount of estimated hours" and any mention of ODCs [Other Direct Costs] from the solicitation in response to questions from prospective offerors; (4) in advance of timely submitting its proposal, plaintiff did not object—formally or informally—to the terms of the solicitation; (5) the Air Force awarded the contract to VFS on August 6, 2015; (6) plaintiff lodged a protest with the GAO on August 13, 2015, challenging the contract award; (7) plaintiff lodged a supplemental protest with the GAO on August 21, 2015, objecting

to the Air Force's failure to provide offerors with its "predetermined amount of estimated hours" for each labor category; (8) the Air Force notified the GAO of its intent to take corrective action on September 11, 2016; (9) the GAO dismissed plaintiff's protests on September 15, 2015; (10) the Air Force proceeded with its corrective action, which consisted of opening discussions, requesting final proposal revisions, and making a new award decision; (11) the corrective action did not include any amendments to the solicitation; (12) during discussions, plaintiff advised the Air Force that it objected to two purported solicitation defects—the absence of past performance as an evaluation factor and the absence of ODCs from the price evaluation—and indicated that it did not "waive any right to challenge [these] solicitation defect[s] in the event [it] is not awarded the contract"; (13) final proposal revisions were due on November 20, 2015; (14) plaintiff filed this protest on November 19, 2015, challenging the terms of the solicitation; and (15) plaintiff advised the Air Force on November 20, 2015, that the materials it had already submitted constituted its final proposal revision.

Defendant argues that under the waiver rule set forth in <u>Blue & Gold Fleet</u>, plaintiff should have protested the terms of the solicitation prior to the April 1, 2015 proposal submission deadline—"the close of the bidding process"— because all of the defects currently alleged by plaintiff were apparent at the time that the Air Force issued the solicitation. Defendant further contends that the Air Force's decision to take corrective action did not extend the deadline for plaintiff to protest the terms of the solicitation because the Air Force did not amend the solicitation as part of its corrective action; in other words, the purported solicitation defects that plaintiff is challenging in this post-corrective-action protest are the same purported solicitation defects that existed when the Air Force first issued the solicitation. Because plaintiff did not file this protest before the original deadline for filing proposals, defendant argues, it waived its challenges to the unchanged terms of the solicitation.

In arguing that it has not waived its challenges to the terms of the solicitation, plaintiff relies on a hypertechnical reading of the language used by the Federal Circuit in <u>Blue & Gold Fleet</u> and <u>COMINT Systems</u>. In <u>Blue & Gold Fleet</u>, the Federal Circuit held that an objection to a patent solicitation error must be raised "prior to the close of the bidding process," 492 F.3d at 1313, and in <u>COMINT Systems</u>, the Federal Circuit held that an objection to a patent solicitation error must be raised "prior to the award of the contract," 700 F.3d at 1382. Plaintiff remarks that as a result of the Air Force's decision to take corrective action, the Air Force reopened the competition, allowed for the submission of final proposal revisions, and planned to make a new award decision. These actions, plaintiff contends, constituted a reopening of the bidding process. Because it filed this protest before the deadline for submitting final proposal revisions (and,

consequently, before the Air Force made a new award decision), plaintiff argues that it filed its protest before "the close of the bidding process" and before "the award of the contract."

In light of the rationale underlying the <u>Blue & Gold Fleet</u> waiver rule, plaintiff's hypertechnical construction of the rule is untenable. The Federal Circuit explained in <u>Blue & Gold Fleet</u> that the purpose of the waiver rule was to prevent an offeror with knowledge of a solicitation defect from sitting on that knowledge until after the procuring agency awarded the contract and then, if unsuccessful in securing the contract, using that knowledge—along with any knowledge gleaned during the competition and from the debriefing—as the basis for a protest in a second attempt to secure the contract. 492 F.3d at 1314. As the Federal Circuit noted, to allow an offeror two bites at the apple would be unfair to, and costly for, the procuring agency and the other offerors. <u>Id.</u> In fact, it explained in <u>COMINT Systems</u> that the policy underlying the <u>Blue & Gold Fleet</u> waiver rule supported the extension of the rule "to all pre-award situations." 700 F.3d at 1382.

Here, the purported solicitation defects identified by plaintiff existed when the Air Force issued the solicitation on February 18, 2015. As a consequence, plaintiff had ample opportunity to challenge these <u>purported defects</u> prior to the April 1, 2015 proposal submission deadline, either through an agency-level protest, by lodging a protest at the GAO, or by filing a protest in this court. Indeed, plaintiff does not argue that raising such a challenge was impractical or that its failure to do so was excusable for good cause. It was not until the Air Force awarded the contract to another offeror that plaintiff, in a supplemental GAO protest, objected to the terms of the solicitation. Binding precedent makes clear that this objection was untimely.

<u>Phoenix Mgmt., Inc. v. United States</u>, 125 Fed. Cl. at 181–82 (first alteration and emphasis added). The same is true in the above captioned protest, protestor had ample knowledge of the "purported defects" and had opportunity to protest the Solicitation before proposals were due, and failing to do so, cannot now raise a challenge to the Solicitation.

Additionally, protestor argues "Utech raised the problem to the agency during the contract-formation process." Defendant argues that "[t]he close of bidding ended here on February 16, 2021, and Utech waited over a year before protesting with the agency in April of 2022. Utech cannot credibly argue that it protested before the close of the bidding process, and the cases it cites cannot change that fact either." (alteration added). As explained above, <u>Blue & Gold</u> does not allow this protestor's challenge after the close of bidding, which as correctly noted by defendant, occurred on February 16, 2021.

Finally, protestor argues:

<u>Blue & Gold's</u> holding is inapplicable where a challenge rests on a statute or regulation that is protective of the protestor. As the Federal Circuit noted

in <u>The Boeing Co. v. United States</u>, 64 CCF ¶ 81,971 (Fed. Cir. Aug. 10, 2020):

> Boeing also contends that the doctrine is inapplicable where a challenge rests on a statute that is protective of the contractor and not primarily of the government, an exception that applies, Boeing says, to 41 U.S.C. §1503(b). Boeing Br. at 46–52.

> <u>Id.</u> It seems evident that much of the applicable law in this protest, including FAR 15.206(e), is "remedial" law, and therefore should be construed broadly in favor of the protected class (*i.e.,* in the case of FAR 15.206(e), the "additional sources [who] likely would have submitted offers had the substance of the amendment been known to them.").

(alteration in protestor's brief; internal reference omitted). The court notes, however, the Federal Circuit in <u>Boeing</u> specifically did not address this argument. The Federal Circuit stated:

> Boeing argues against applicability of that [waiver] doctrine to this case on several grounds. It argues, for example, that there was no *contract* defect or ambiguity because, whereas the contract includes certain clauses requiring compliance with the CAS statute, it does not include a clause requiring compliance with FAR 30.606. Boeing also contends that the doctrine is inapplicable where a challenge rests on a statute that is protective of the contractor and not primarily of the government, an exception that applies, Boeing says, to 41 U.S.C. § 1503(b). We need not and do not reach either of those contentions. Instead, we address Boeing's primary contention, and conclude that there was no waiver here because the government has not shown that Boeing bypassed an avenue of relief on the merits from the agency—indeed, has not even shown that Boeing bypassed a judicial forum that would adjudicate its contention on the merits.

> As already noted, the government here concedes that, when entering into the contract at issue, its adherence to FAR 30.606 was "mandatory," "FAR 30.606 could not be waived," and "contracting officers are precluded from granting such a waiver." In other words, it is undisputed that, if Boeing had objected to FAR 30.606 during the negotiations to enter into the contract, the agency would have had to reject the objection. The agency could not lawfully have given Boeing the relief of rejecting application of FAR 30.606 to the contract.

<u>Boeing Co. v. United States</u>, 968 F.3d 1371, 1378 (Fed. Cir. 2020) (emphasis in original; internal reference omitted; alteration added). Protestor acknowledges the same in its brief:

> The Federal Circuit decided that it did not need to reach this issue in Boeing, because there were other bases on which to rule out Blue & Gold waiver. Perhaps the Court will reach the same conclusion here. If not, however, then this Court will need to resolve this issue, because regulations like FAR 15.206(e) clearly are "protective of the [complainant] and not primarily of the Government."

(alteration in protestor's brief). Furthermore, protestor does not argue that FAR 30.606 applies in the above captioned protest, even though FAR 30.606 was a basis for the Federal Circuit's decision in the Boeing case.

None of protestor's arguments for an exception to the Blue & Gold framework in the above captioned protest have merit. As determined above, protestor waived its protest grounds under the Blue & Gold waiver rule. See M.R. Pittman Grp., LLC v. United States, 68 F.4th at 1284; Blue & Gold, Fleet, L.P. v. United States, 492 F.3d at 1313. Protestor's failure to timely challenge the Solicitation waives any challenge now in this court and protestor has failed to state a claim.

## CONCLUSION

In sum, the court finds that because protestor chose not to submit a proposal or protest the terms of the Solicitation before the due date for proposals, protestor lacks the direct economic interest necessary to be an "interested party" and, therefore, protestor has failed to state a claim for relief. Furthermore, by failing to challenge the language of the Solicitation before proposals were due, protestor has waived its opportunity to bring its challenge in this court. Protestor's complaint is **DISMISSED**. Defendant and intervenor's motions to dismiss protestor's bid protest complaint for failure to state a claim are **GRANTED**. The Clerk of Court shall enter **JUDGMENT** consistent with this court's Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**